Mildred DOLGOW, Benjamin Dolgow, Sarah Fischer, and Reuben Isaacson, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

Dillon ANDERSON et al., Defendants.

No. 66–C–1057.

United States District Court
E. D. New York.

Jan. 3, 1968.

See also D.C., 43 F.R.D. 21.

476

Avrom S. Fischer, Brooklyn, N. Y., for plaintiffs.

Shearman & Sterling, New York City, for defendant Monsanto Co., John A.

Wilson, Michael J. DeSantis, New York City, of counsel.

Sullivan & Cromwell, New York City, for individual defendants, Roy H. Steyer, New York City, of counsel.

Securities and Exchange Commission, Washington, D. C., amicus curiae, Philip A. Loomis, Jr., David Ferber, Richard M. Phillips, Richard E. Nathan, Washington, D. C., of counsel.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Allegations | 478 |
| II. | Class actions generally | 480 |
| III. | Alternatives to class action | 482 |
| | A. Available Administrative Remedies | 482 |
| | B. Need for Private Action | 484 |
| IV. | Advantages of Class Action in Affording Relief | 484 |
| | A. Advantages to Individual Investors | 484 |
| | B. Therapeutic value | 485 |
| | 1. Historical background of shareholder litigation | 485 |
| | 2. Rule 23 class action | 487 |
| | 3. Prevention of abuse under Rule 23 | 487 |
| V. | Common and Individual Issues | 488 |
| | A. Common Issues | 488 |
| | B. Individual Issues | 490 |
| VI. | Definition of class | 491 |
| VII. | Adequate Representation | 493 |
| | A. Miniscule Holdings of Plaintiffs | 494 |
| | B. Numerical Disparity Between Those Before the Court and Those They Seek to Represent | 495 |
| | C. Ability of Plaintiffs' Attorney to Adequately Represent Large Class | 496 |
| VIII. | Notice | 497 |
| | A. Notice to Monsanto Shareholders | 498 |
| | 1. Fiduciary duty owed to purchasers of stock by the corporation and the selling directors, officers, and other insiders | 498 |
| | 2. Interest of defendants in res judicata decree | 499 |
| | 3. Ability to bear expense of notice | 499 |
| | B. Notice by Publication to Those Who Are No Longer Shareholders | 500 |
| IX. | Hearing | 501 |

## OPINION AND ORDER

WEINSTEIN, District Judge.

Four purchasers of Monsanto Company common stock sue that corporation and its principal officers and directors. Defendants are charged with engaging in a scheme to manipulate the price of Monsanto stock so that the individual defendants could sell their own stock in

the corporation at an artificially inflated price.

Cross-motions have been made by the corporate defendant and the plaintiffs under Rule 23(c) (1) of the Federal Rules of Civil Procedure to determine whether this litigation should be maintained as a class action. On the invitation of the Court, the Securities and Exchange Commission (S.E.C.) has submitted a helpful brief amicus on the question. For the reasons indicated below, decision must be postponed pending a preliminary hearing at which evidence will be received with respect to the possibility of plaintiffs' prevailing on the merits.

## I. ALLEGATIONS

Monsanto is one of the world's largest producers of chemical synthetic fibres, with assets and sales of hundreds of millions of dollars. The company's securities are widely held; it has almost one hundred thousand shareholders and its more than thirty million shares of common stock are traded on the New York Stock Exchange. During the period in which the plaintiffs seek to represent all purchasers of Monsanto securities, there were approximately one hundred thousand purchasers of Monsanto stock. In addition, as of June 30, 1967, there were approximately $408,982,000 in principal amount of debt securities outstanding.

Recently, Monsanto—like most other concerns in the chemical fibres industry —has faced serious economic problems. Its earnings declined from three dollars and eighty-nine cents per share in 1965 to three dollars and forty-eight cents per share in 1966. Correspondingly, the price of its common stock has declined, from a high of above ninety dollars per share during 1965 to a current price in the mid-forties.

Three of the plaintiffs are presently Monsanto stockholders: Mildred and Benjamin Dolgow (Dolgows) own twenty-three shares as joint tenants; Sarah Fischer (Mrs. Fischer) owns seventy-two shares. The fourth plaintiff, Reuben Isaacson, purchased three hundred shares on April 9, 1965 at a total cost of approximately twenty-seven thousand dollars and sold them (along with six additional shares he acquired as a stock dividend) on October 5, 1966 at a loss of fourteen thousand seventy-six dollars and eighty-eight cents.

The Dolgows and Mrs. Fischer each purchased one share of Monsanto stock on December 22, 1964 and again on December 23, 1965. These purchases were made in connection with a two percent stock dividend issued by Monsanto in those years. If the number of shares registered in the name of a shareholder was not evenly divisible by fifty, that person was entitled to a fractional interest in a share. He could then either purchase an additional fractional interest to make up one full share or have Monsanto sell his fractional interest. If he chose to purchase an additional fractional share, Monsanto would purchase it for him on the open market. The purchase price of the fractional interest was calculated on the basis of the average price of all shares purchased by Monsanto, as agent for the stockholders, on the New York Stock Exchange in connection with the rounding out to whole shares of fractional interests in shares. There were fifty-four thousand three hundred thirty-five shareholders who purchased fractional shares in connection with the 1964 stock dividend and fifty-five thousand three hundred eighty-two shareholders who purchased fractional shares in connection with the 1965 stock dividend.

Plaintiffs purchased their Monsanto stock at prices approximately twice those prevailing when this suit was commenced. They claim they did so in reliance upon the false statements and reports issued by the defendants and without knowledge of the company's actual financial condition, and that the prices they paid had not been determined

by supply and demand, but had been manipulated to an artificially high level by the defendants. In addition, Mrs. Fischer claims to have purchased one share of Monsanto stock in December, 1965, in reliance upon a false statement filed in September, 1965 by Edgar Monsanto Queeny, then chairman of Monsanto's Board of Directors, in which he stated he had not disposed of any of his holdings in Monsanto.

The Dolgows and Mrs. Fischer seek individual damages of one hundred and sixty dollars and Isaacson seeks damages of fourteen thousand seven hundred and sixty dollars. They also request rescision and punitive damages. In addition, they each seek similar relief on behalf of all purchasers of Monsanto securities since December, 1964 "similarly situated."

The complaint and supporting affidavits allege common law fraud and violations of sections 5, 12, and 17 of the Securities Act of 1933, 15 U.S.C. § 77e (sale of securities without a registration statement being in effect); 15 U.S.C. § 77*l* (selling securities "by means of a prospectus or oral communication, which includes an untrue statement of a material fact"); 15 U.S.C. § 77q (scheme to defraud in the sale of securities); and sections 9, 10(b), 16, 18, and 29 of the Securities Exchange Act of 1934; 15 U.S.C. § 78i (manipulation of securities prices); 15 U.S.C. § 78j (use of manipulative and deceptive devices in connection with the purchase or sale of securities); 15 U.S.C. § 78p (directors, officers and principal shareholders must file a monthly report indicating any change in their holdings in their own companies); 15 U.S.C. § 78r (liability for misleading statements); 15 U.S.C. § 78cc (invalidity of any contract made in violation of any provision in this chapter); Rules 10b–5 and 16a–1 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 (employment of manipulative and deceptive devices; making an untrue statement of material fact or omitting to state a material fact); 17 C.F.R. § 240.16a–1 (filing of statements by officers, directors, and principal shareholders); and the rules of the New York Stock Exchange.

The plaintiffs allege that "commencing on or about the fall of 1964 and continuing thereafter down to date, defendants have been and still are engaged for their own personal gain, profit, benefit, and aggrandizement in a continuous and common plan, scheme and conspiracy" "with the purpose of manipulating and artificially raising the price of the common stock of Monsanto" to "an artificial level of between $70 and $95 per share." During this period, the defendants are alleged to have sold over fifty thousand shares of their own holdings in Monsanto at an average price of eighty dollars per share—for approximately $4,000,000— and within two months after they ceased selling their own shares, Monsanto plummeted to less than forty dollars per share.

Pursuant to this scheme, the defendants are alleged to have committed the following illegal acts:

(1) The defendants concealed "inside information" which would have indicated that Monsanto was not doing well and would experience a decline in earnings and growth and instead made numerous false and misleading statements to stockholders, the public and the press which conveyed precisely the opposite picture. For example, it is alleged that the defendants estimated that Monsanto's earnings would rise from three dollars and eighty-nine cents per share in 1965 to between four dollars and twenty cents and four dollars and sixty cents per share in 1966, whereas earnings actually declined to three dollars and forty-eight cents per share. The failure of Monsanto to achieve the earnings that were being projected for it, the plaintiffs contend, was due primarily to the advent of strong price competition, which the defendants clearly should have foreseen since the Du-Pont patents on nylon, for which Mon-

**480**

santo was the sole American licensee, were due to expire in 1965, thereby enabling competitors to enter this chemical fibre market.

(2) Edgar Monsanto Queeny (Queeny), a former chairman of the Board of Monsanto, a member of its Board of Directors, and a member of its Stock Option, Bonus and Finance committees, sold five thousand of his own shares when the price was high. He filed a false report with both the New York Stock Exchange and the Securities and Exchange Commission indicating that he had not sold any stock.

(3) During the period when the individual defendants were selling their own shares, Monsanto purchased over three hundred thousand shares of its own stock in connection with its employee stock option plan and fifty thousand shares in connection with its stock bonus plan. Moreover, the pattern of purchases indicates an attempt to manipulate the price of Monsanto; a number of the shares were purchased either above or at the high for the day or within one-eighth of a point of it.

(4) Both Monsanto and the individual defendants failed to register the Monsanto shares which they sold.

The defendants categorically deny that they were involved in any scheme to manipulate the price of Monsanto stock. They point out that substantially all of the individual defendants have retained large blocks of Monsanto stock. Queeny, for example, still holds approximately one hundred and eighty thousand shares worth between seven and eight million dollars even on today's market. They contend that neither Monsanto's earnings nor the market for its stock showed any significant downtrend until the middle of 1966. Monsanto's decline, it is asserted, must be viewed in its proper perspective. Similar declines were experienced by the chemical and fibres industry as a whole. For example, the common stock of E. I. DuPont de Nemours & Co. dropped from two hundred

ninety-three dollars per share in November, 1964 to one hundred forty-three dollars per share in December, 1966.

As regards the Queeny false report, the defendants contend that Queeny did not sell five thousand shares, but merely "exchanged" them for shares in an investment trust. They admit that Queeny failed to report the change in his holdings, but place the blame on the negligence of Queeny's secretary. The false report was allegedly prepared and signed by Queeny's secretary—a task she regularly performed—without Queeny's knowledge. Two months later, Queeny's secretary realized that she had inadvertently failed to report this transaction and filed a signed corrected report—again without Queeny's knowledge.

Finally, the defendants vehemently dispute plaintiffs' claim that Monsanto purchased over three hundred and fifty thousand shares of its own stock during the period in question. Rather, it is alleged that the correct figure is closer to twenty thousand shares. Much of the stock Monsanto distributed pursuant to its bonus plan had been obtained prior to 1965.

## II. CLASS ACTIONS GENERALLY

Plaintiffs claim that this action is maintainable as a class action because of the predominance of common questions of law and fact. Rule 23(a) (3), (b) (3). They urge that this litigation should be allowed to proceed as a class action because of the superiority of this device over "other available methods for the fair and efficient adjudication of the controversy." Rule 23(b) (3). Rule 23 provides in relevant part:

"Rule 23. CLASS ACTIONS.

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of

the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

Defendants are opposed to permitting the litigation to go forward under Rule 23. In addition to arguing that this action does not meet the requirements of subdivisions (a) and (b) of the Rule, they are appalled at the procedural horrors in the offing. They note the unwieldiness of the classes involved, the likelihood of squabbling among numerous prospective plaintiffs' attorneys, the difficulties inherent in trying the issues affecting each individual member of the class, and the impossibility of plaintiffs with limited resources providing adequate notice and representation to such a large group of people.

Defendants misconceive the court's role in actions of this sort. The Rule 23 class action "as a way of redressing group wrongs is a semi-public remedy administered by the lawyer in private practice"—a cross between administrative action and private litigation. Kalven and Rosenfield, The Contemporary Function of the Class Suit, 8 U.Chi.L. Rev. 684, 717 (1941). Once the court is convinced that there is substantial merit to plaintiff's claims and that the class action device is the practicable method of vindicating these claims, it will not let procedural difficulties stand in its way. As the Supreme Court has declared:

"[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946).

See also J. I. Case v. Borak, 377 U.S. 426, 433–434, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964) ("it is the duty of the [federal] courts to be alert to provide such remedies as are necessary to make effective the congressional purpose"); Deckert v. Independence Shares Corp., 311 U.S. 282, 288, 61 S.Ct. 229, 233, 85 L.Ed. 189 (1940) ("The power to *enforce* implies the power to make effective the right of recovery afforded by the \* \* \* [Securities Act of 1933]. And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case.") Cf. Securities and Exchange Commission v. Wong, 252 F.Supp. 608, 613–614 (D. Puerto Rico 1966).

A pragmatic approach is called for in order to overcome the numerous difficulties that are likely to arise in the course of a lawsuit of this magnitude. If the trial court assumes a more active role than it normally does and works

closely with the attorneys, these difficulties should not prove to be insuperable. See, e. g., Cohn, The New Federal Rules of Civil Procedure, 54 Geo.L.J. 1204, 1214 (1966) ("A procedure that contains built-in flexibility"); Note, 51 Va.L.Rev. 629, 651 (1965) ("under the new proposal the active role of the court is readily apparent"); cf. Siegel v. Chicken Delight, Inc., 271 F.Supp. 722, 727 (N.D.Cal. 1967); Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673, 684 (N.D. Ind.1966).

Because the dual requirements of subdivision (b) (3)—lack of a practicable alternative procedure and predominance of common questions—are central to the decision, the Court will consider them first.

### III. ALTERNATIVES TO CLASS ACTION

"In our complex modern economic system where a single harmful act may result in damages to a great many people there is a particular need for the representative action * * *." Escott v. Barchris Construction Corp., 340 F.2d 731, 733 (2d Cir.), cert. denied sub nom. Drexel & Co. v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965). The class action is one of the important means of protecting such scattered rights.

■ Where the basis for allowing a class action is predicated upon the predominance of common questions of law and fact—as is the case here—the court must find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b) (3). See Advisory Committee Notes, 39 F.R.D. at 103 (rule requires court to "assess the relative advantages of alternative procedures for handling the total controversy").

Among the various alternative procedural devices are joinder, intervention, consolidation and the test case. In addition, administrative agencies—here, the Securities and Exchange Commission— have been assigned an increasing share of the task of protecting private rights. Administrative process often provides the best alternative to a class action.

■ The disclosure provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 were designed to protect the small investor by preventing those "on the 'inside'" from taking "advantage of their superior knowledge to profit at the expense of the stockholders or of the investing public." Tracy and MacChesney, The Securities Exchange Act of 1934, 32 Mich.L.Rev. 1025, 1032 (1934). See S.E.C., Work of the S.E.C., in Baker & Carey, Corporations, A–51, A–54 to 55 (3rd ed. 1959). In a case involving small shareholders suing a large corporation and its directors, the "relative advantages of alternative procedures" must be assessed in terms of their ability to safeguard the interests of the general investing public. See, e. g., J. I. Case v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964) ("duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose").

#### A. *Available Administrative Remedies.*

The securities laws provide both administrative and civil remedies. In inviting the S.E.C. to intervene, the Court stated that it was particularly interested in the practice of the government—both civil and criminal—in cases such as this. The Commission's response emphasized the importance of class actions in protecting the investing public. Because the Commission's brief reflects a fundamental policy sympathetic to the class action, a substantial portion is set out below (emphasis has been supplied and footnotes omitted):

*I. THE ACTIVITIES OF THE SECURITIES AND EXCHANGE COMMISSION DO NOT ELIMINATE THE NEED FOR CLASS-ACTION PROCEDURE IN PRIVATE ACTIONS BASED ON VIOLATIONS*

OF THE FEDERAL SECURITIES LAWS.

\* \* \* \* \*

As the agency primarily entrusted with the administration and enforcement of the federal securities laws, this Commission is empowered to conduct investigations, seek injunctive relief, suspend trading in securities, apply administrative sanctions, and refer evidence of violations to the Attorney General for criminal prosecution. *Because of budgetary limitations and alternative demands on available manpower, the Commission cannot fully investigate or take action in every case of possible violation.* And while injunctive relief or suspension of trading may be effective to protect many persons who might otherwise have been injured, others may already have been harmed, since *few securities frauds or manipulations are brought to the Commission's attention at such an early stage that preventative measures will serve to protect all investors at whom the harmful acts were directed.*

Problems of proof in private lawsuits, however, are sometimes simplified by reason of criminal prosecutions or administrative proceedings, as well as by injunctions, since these may make available to injured investors the results of the Commission's investigation. Also, on occasion, violators in an effort to stave off such proceedings or to ameliorate the sanction or punishment that might be imposed have repaid investors or agreed not to plead certain defenses to civil actions they might bring. But *the Commission cannot compel repayments through its administrative sanctions.* While in rare cases, as an adjunct to injunctive relief, the Commission has urged a court to deprive violators of their illegal gains by directing that these be paid to individuals who have been injured by their violations, *even in*

such cases the Commission does not seek to make investors whole; it seeks merely to deter violators by making violations unprofitable. Thus, the Commission recently stated in one such case that it was "not acting on behalf of the \* \* \* [injured parties] to seek money damages. \* \* \*" It continued:

"As a law enforcement agency it is requesting disgorgement of profits illegally obtained, because effective deterrence requires more than an injunction limited to future violations." (Footnote omitted.)

Any recovery in such a case that would inure to the benefit of injured investors would, of course, constitute a set-off against any relief to which they may be individually entitled, but a distribution of these profits is not necessarily a substitute for recovery of damages. Where, for example, as is alleged in the case at bar, a market manipulation may have caused a great many persons to have paid an arbitrarily high price for securities they purchased, the aggregate of their injuries is essentially unrelated to the profits, if any, that the defendants may be shown to have unlawfully made. Since *none of the measures available to the Commission under the Securities Act or the Securities Exchange Act is designed to provide compensation to injured investors for the damages they have suffered,* the Commission has made clear that it "\* \* \* in no sense is to be considered a collection agency."

The conclusion of the S.E.C. was:

"Since the enforcement activities of this Commission do not serve to make whole investors who have been injured by a fraudulent course of business and since it is economically impracticable in many instances for investors individually to pursue available remedies, the representative action appears to provide the most meaningful method by which their claims may be pursued and

the Congressional policy favoring such remedies may be vindicated."

See also 3 Loss, Securities Regulation 1824 (2d ed. 1961) ("An even more effective device than the class action would be direct enforcement by the Commission of restitution to the victims of violation of the statutes. The Commission's approach to the possibility has thus far been cautious"); Cherner v. Transitron Electronic Corp., 201 F.Supp. 934, 937 (D. Mass.1962) ("The S.E.C. has made it clear that it does not regard its function as including the presentation to courts * * * the claims of individuals.").

### B. *Need for Private Action.*

Thus, "[p]rivate enforcement * * * provides a necessary supplement to Commission action," by both affording relief to those injured by violations of the securities laws and serving as a deterrent to future wrong-doing. J. I. Case v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). See Aranow and Einhorn, Corporate Proxy Contests: Enforcement of S.E.C. Proxy Rules by the Commission and Private Parties, 31 N.Y.U.L.Rev. 875, 883 (1956) ("The right of a stockholder, rather than the Commission itself, to secure court enforcement of the proxy rules of the Securities and Exchange Commission * * * has become an important judicial remedy in a proxy contest."); Cf. Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 318, 85 S.Ct. 1473, 1477, 14 L.Ed.2d 405 (1965) ("Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws."); Philadelphia Housing Authority v. American Radiator and Standard Sanitary Corp., 269 F. Supp. 540, 542 (E.D.Pa.1967) ("[T]he private treble damage action was designed by Congress to serve a dual purpose. Congress intended that those injured by antitrust violations recover their damages. In addition, the treble recovery mechanism was '* * * in-

tended to use private self-interest as a means of enforcement * * *' of the antitrust laws."). Both the Securities Act and Securities Exchange Act expressly provide civil remedies. See, e. g., 15 U.S.C. §§ 77k, 77l, 78i(e), 78r. Even when a private right of action was not expressly granted, the courts have implied one in order to make effective the remedial purpose of federal securities legislation. See, e. g., J. I. Case v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Kardon v. National Gypsum Co., 73 F.Supp. 798 (E.D.Pa. 1947).

### IV. ADVANTAGES OF CLASS ACTION IN AFFORDING RELIEF.

### A. *Advantages to Individual Investors.*

 It is the duty of the federal courts to render private enforcement practicable. Other than the class action, the procedures available for handling proliferated litigation—joinder, intervention, consolidation, and the test case—cannot serve this function in a situation like the one presented here. These alternative devices presuppose "a group of economically powerful parties who are obviously able and willing to take care of their own interests individually through individual suits or individual decisions about joinder or intervention." Frankel, Amended Rule 23 From A Judge's Point of View, 32 Antitrust L. J. 295, 298 (1966). See Kaplan, The Impact of the Electrical Anti-Trust Cases Upon Federal Civil Procedure, 39 F.R.D. 495, 513, 517 (1965) ("The reason for the lack of heavy resort to Rule 23 was that lawyers apprehended that where the claims are large and the individual claimants willing and able to take care of themselves, there is reason for bypassing the class-action procedure.").

 The class action is particularly appropriate where those who have allegedly been injured "are in a poor position to seek legal redress, either because they

do not know enough or because such redress is disproportionately expensive." Kalven and Rosenfield, The Contemporary Function of the Class Suit, 8 U. Chi.L.Rev. 684, 686 (1941). Its "historic mission" has been to "[take] care of the smaller guy." Statement of Professor Ben Kaplan, Reporter of the new Rules, quoted in Frankel, Amended Rule 23 From A Judge's Point of View, 32 Antitrust L.J. 295, 299 (1966). See Escott v. Barchris Construction Corp., 340 F.2d 731, 733 (2d Cir.), cert. denied sub nom. Drexel & Co. v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965) ("The usefulness of the representative action as a device for the aggregation of small claims is 'persuasive of the necessity of a liberal construction of * * * Rule 23.' ").

Subdivision (b) (3) lists as a factor in determining whether the class action is superior to other methods of litigating the controversy "the interest of members of the class in individually controlling the prosecution or defense of separate actions." Particularly apt in this case is the Advisory Committee's emphasis on the impracticality of individual suits where the claim of each prospective plaintiff is small. It noted:

"The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical * * * the amounts at stake for individuals may be so small that separate suits would be impracticable." 39 F.R.D. at 104.

This comment applies with particular force to a case involving tens of thousands of small shareholders. As the S.E. C. amicus brief makes patently clear, "since the difficulty of proving a violation under the securities laws often is great and the injury to individual investors may not be sufficiently large to justify on an individual basis the investigative and litigation expense involved, a class action may be the only meaningful method by which private rights may be effectively enforced." See Escott v. Barchis Construction Corp., 340 F.2d 731, 733 (2d Cir.), cert. denied sub nom. Drexel & Co. v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965) ("there must be a practical method for combining these small claims, and the representative action provides that method. The holders of one or two of the debentures in the present action could hardly afford to take the risk of an individual action.") ; Weeks v. Bareco Oil Co., 125 F.2d 84, 90 (7th Cir. 1941) ("To permit the defendants to contest liability with each claimant in a single, separate suit, would in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what we think the class suit practice was [designed] to prevent.") ; 3 Loss, Securities Regulation 1819 (2d ed. 1961) ("the ultimate effectiveness of the federal remedies [provided by the securities laws] * * * may depend in large measure on the applicability of the class action device.").

On oral argument in the present case, it was assumed that, in view of the fact that the costs of the litigation would far exceed any damages the individual plaintiffs might possibly recover, if this case does not proceed as a class action, it is unlikely that it would proceed at all. Thus, to hold that this action could not proceed as a class action "would * * * be tantamount to a denial of private relief." J. I. Case v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964).

B. *Therapeutic Value.*

In addition to providing a means of affording relief to individual investors, the class action has a substantial therapeutic value in the field of securites regulation.

1. *Historical background of shareholder litigation.*

It has long been recognized that, in our modern economic world, character-

ized by a separation of ownership and management, the class suit by shareholders provides a primary means of enforcing desired standards of conduct on the part of corporate officials. The historic development of stockholder litigation in this area has been summarized by the Supreme Court as follows:

"As business enterprise increasingly sought the advantages of incorporation, management became vested with almost uncontrolled discretion in handling other people's money. The vast aggregate of funds committed to corporate control came to be drawn to a considerable extent from numerous and scattered holders of small interests. The director was not subject to an effective accountability. That created strong temptation for managers to profit personally at expense of their trust. The business code became all too tolerant of such practices. Corporate laws were lax and were not self-enforcing, and stockholders, in face of gravest abuses, were singularly impotent in obtaining redress of abuses of trust.

"Equity came to the relief of the stockholder, who had no standing to bring civil action at law against faithless directors and managers. Equity, however, allowed him to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own. It required him first to demand that the corporation vindicate its own rights but when, as was usual, those who perpetrated the wrongs also were able to obstruct any remedy, equity would hear and adjudge the corporation's cause through its stockholder with the corporation as a defendant, albeit a rather nominal one. *This remedy born of stockholder helplessness was long the chief regulator of corporate management and has afforded no small incentive to avoid at least grosser forms of betrayal of stockholders' interests. It is argued, and not without reason, that without it*

*there would be little practical check on such abuses."* Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 547–548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949) (emphasis supplied).

See also Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 371, 86 S.Ct. 845, 15 L.Ed. 2d 807 (1966) ("derivative suits have played a rather important role in protecting shareholders of corporations from the designing schemes and wiles of insiders who are willing to betray their company's interests in order to enrich themselves"); Hornstein, Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, 69 Harv.L.Rev. 658 (1956) ("there can be no doubt that these derivative suits have materially raised the standards of fiduciary relationships and of other economic behavior"); Kalven and Rosenfield, The Contemporary Function of the Class Suit, 8 U.Chi.L.Rev. 684, 691 (1941) ("there is general agreement that it [shareholder's derivative suit] furnishes the major sanction behind the fiduciary rules of corporate law").

While the shareholder suit served this extremely useful social purpose, it also "provided opportunity for abuse" in the form of the so-called "strike suit":

"Suits sometimes were brought not to redress real wrongs, but to realize upon their nuisance value. They were bought off by *secret settlements* in which any wrongs to the general body of share owners were compounded by the suing stockholder, who was mollified by payments from corporate assets. These litigations were aptly characterized in professional slang as 'strike suits.'" Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949) (emphasis supplied).

In an effort to deal with the problems created by the strike suit, many states in the early 1940's passed legislation which sought to sharply curtail resort to the shareholder action. See, e. g., N.Y. Business Corporation Law, McKinney's Consol.Laws, c. 4, § 627 (security for expen-

ses), § 626 (ownership of shares at time of suit). See generally, Hornstein, New Aspects of Stockholders' Derivative Suits, 47 Colum.L.Rev. 1 (1947) (sharply critical of legislation); Note, Security for Expenses in Shareholders' Derivative Suits: 23 Years' Experience, 4 Colum. Journal of Law and Social Problems 50 (1968) (security for expense legislation has not effectively curtailed stockholder derivative actions).

### 2. Rule 23 class action.

■ The Rule 23 class action has much the same prophylactic function in the field of securities regulation that the shareholder derivative suit has in the area of general corporate law. In addition to seeking to compensate those directly injured, the federal securities laws are designed to deter corporate officials and insiders from engaging in the kind of machinations alleged to have taken place here. See Derdiarian v. Futterman Corp., 223 F.Supp. 265, 271 (S.D. N.Y.1963) ("Quite clearly the statutes relied on here are meant to deter bad practices in the sale of securities"); Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227 (1934) ("It is not the object of the Act simply to provide a legal remedy for the investor who has bought securities upon a false representation, to compensate him for the loss incurred. Even the provisions for civil liability are calculated to be largely preventive rather than redressive."); Douglas and Gates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 173 (1934) ("The civil liabilities imposed by the Act are not only compensatory in nature but also *in terrorem*. They have been set high to guarantee that the risk of their invocation will be effective in assuring that the 'truth about securities' will be told"). By making real the threat of exposure and civil liability, the class action also serves to effectuate this objective. See Hornstein, Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, 69 Harv.L.Rev. 658, 663 (1956) ("the record of litigated cases is prophylactic—a deterrent to future wrong-doing. Every successful suit duly rewarded encourages other suits to redress misconduct and by the same token discourages misconduct which would occasion suit"); cf. Douglas, Directors Who Do Not Direct, 47 Harv.L.Rev. 1305, 1307, 1329–34 (1934) ("[S]ome method must be devised to mobilize scattered and disorganized stockholders into an active and powerful group so that there may be a competent and respectable patrol in the field of finance.").

### 3. Prevention of abuse under Rule 23.

■ Those who criticize the class action on the grounds that it stirs up plaintiffs and serves only to provide fees for attorneys overlook the fact that we are not dealing with the traditional lawsuit which concerns primarily those litigants before the court. The public's concern with openness and honesty in public securities markets gives it an interest no less significant than that of particular plaintiffs and defendants.

Moreover, Rule 23 has built-in limitations against abuse. As the Supreme Court pointed out in Cohen v. Beneficial Industrial Loan Corp., the strike suit constituted the principal misuse of this device. Rule 23 remedies this abuse by barring the extortionate secret settlement. See Hornstein, New Aspects of Stockholders' Derivative Suits, 47 Colum. L.Rev. 1, 3 (1947) ("Had the legislators really been concerned with the so-called 'abuse' of stockholders' suits, the extortionate secret settlement, the remedy was painfully obvious: to bar secret settlements. This patent solution, twice recommended by the Law Revision Commission, was studiously avoided by the legislators"); cf. Siegel v. Chicken Delight, Inc., 271 F.Supp. 722, 727 (N.D.Cal.1967) (ability of court under amended Rule 23 "to safeguard the interests of all parties"). Subdivision (e) of the Rule imposes the requirement that any compromise of the action must be approved by

the court and the court must notify members of the class of the compromise.

In addition, subdivision (d) provides for notice to permit other members of the class to join the litigation. It states:

"the court may make appropriate orders * * * (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action that notice be given in such manner as the court may direct to some or all of the members of any step in the action * * * or of the opportunity to signify whether they concede the representation fair and adequate, to intervene and present claims and defenses, or otherwise to come into the action; * * * "

Additional prerequisites which must be satisfied by the plaintiffs before a litigation can proceed as a class action—that the parties before the court must be members of the class they seek to represent and must make a preliminary showing that there is good ground to believe that there is a substantial possibility of success—also serve to discourage suits brought solely for their "nuisance value." Finally, under both the Securities Act of 1933 and the Securities Exchange Act of 1934, the court is granted discretion to require the plaintiff to file a bond to cover a defendant's costs and attorney's fees. See 15 U.S.C. §§ 77k(e), 78i(e), 78r(a).

## V. COMMON AND INDIVIDUAL ISSUES

Once the court has decided that a class action is superior to other available procedural devices, the crucial prerequisite for the maintenance of a class action under subdivision (b) (3) is the requirement that there be "questions of law or fact common to the members of the class" and that such questions must "predominate over any questions affecting only individual members." The predominance of these common questions, in turn, furnishes the basis for defining the class or classes involved to the acceptable degree of precision.

Defendants argue strongly that this requirement is not met in the present action for two reasons: first, the alleged misrepresentations were not made in one, or even several, important documents distributed simultaneously to all purchasers, such as a prospectus, but, rather, were contained in a variety of statements, each of which were not necessarily brought to the attention of all investors, which defendants allegedly "caused to be published and disseminated" to the general public, the financial community, and Monsanto stockholders; and second, each member of the class must separately prove reliance, compliance with the statute of limitations and damages.

### A. Common Issues.

There can be little doubt that an action on behalf of a group of defrauded securities purchasers presents a particularly appropriate reason for a class action. The resolution in one litigation of the common questions relating to the existence, character, and materiality of the alleged false statements avoids the need for each injured investor to attempt to prove—and for the defendants to disprove—anew these basic allegations. Thus, it is virtually certain that a class action will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." Advisory Committee Notes to Rule 23, 39 F.R.D. at 102–103.

The critical factor in a securities fraud case is the type of misrepresentation involved. As the Advisory Committee pointed out:

"In this view, a fraud perpetrated on numerous persons by the use of *similar misrepresentations* may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there

was *material variation in the representations* made or in the kinds or degrees of reliance by the persons to whom they were addressed." 39 F.R.D. at 103 (emphasis supplied).

Compare Harris v. Jones, 41 F.R.D. 70 (D.Utah 1966) (class action: identical written misrepresentations made to general investing public) with Hirschi v. B. & E. Securities, Inc., 41 F.R.D. 64 (D.Utah 1966) (no class action: differing face-to-face oral misrepresentations). The fact that the misrepresentations were made over a period of time will not preclude a class action, provided they were made pursuant to a common scheme. See, e. g., Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 914 (9th Cir. 1964) ("since the complaint alleges a common course of conduct over the entire period, directed against all investors, generally relied upon, and violating common statutory provisions, it sufficiently appears that the questions common to all investors will be relatively substantial"); Richland v. Cheatham, 272 F.Supp. 148, 153 (S.D. N.Y.1967) ("plaintiffs * * * have not chosen to plead one manipulation extending throughout this entire period, i. e., 'a common course of conduct over the entire period'"); Fischer v. Kletz, 41 F.R.D. 377, 381 (S.D.N.Y.1966) ("interrelated, interdependent, and cumulative" financial statements); 3A Moore, Federal Practice ¶ 23.10 at 3448 (2d ed. 1967) ("The spurious class action has proved useful where a large number of purchasers or holders of securities claim to have been defrauded by a common course of dealing on the part of the defendants"); Comment, Spurious Class Actions Based Upon Securities Frauds Under the Revised Federal Rules of Civil Procedure, 35 Ford.L.Rev. 295, 300 (1966). Compare Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal. 1967) (antitrust action; "there is present herein a common nucleus of operative facts even though there may be lacking complete identity") and City of Phila-

delphia v. Morton Salt Co., 248 F.Supp. 506 (E.D.Pa.1965) with School District of Philadelphia v. Harper & Rowe Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa. 1967).

■ Plaintiffs have successfully brought themselves within the "common course of conduct" line of cases. They have alleged a "continuous and common plan" to manipulate the price of Monsanto stock. All of the alleged false statements were addressed to the general investing public, not to individual shareholders.

Unpersuasive is defendants' reliance upon the fact that there are involved, a plethora of statements, not all of which were necessarily brought to the attention of all investors. This contention was adequately disposed of in the recent case of Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y. 1966), in which the court declared:

> "While there may be different kinds of misrepresentations alleged with respect to different plaintiffs, including some oral misrepresentations, and while such factors might have led to a dismissal of a class action under the old rule * * * *the new rule 23 provides the flexibility to permit this action to proceed.*" 41 F.R.D. at 45 (emphasis supplied).

■ There is bite, however, in defendants' contention that there is no consistent and integrated course of conduct directed to all members of a possible class. At a hearing—more fully described below—plaintiffs will be required to show that statements emanating from the defendants relating to Monsanto's future prospects during the period in question were consistently overoptimistic—that is, that a consistent course of misconduct was involved. If, for example, it develops that while some individual defendants were making intermittent unwarranted optimistic appraisals, the company's annual reports were portraying the company's future

prospects in more realistic terms, the class allegations will be stricken or the class broken up into one or more drastically narrowed subclasses encompassing only those purchasers who acquired their shares immediately after issuance of a series of false statements. Cf. *Richland v. Cheatham*, 272 F.Supp. 148 (S.D.N.Y.1967) (four separate periods of manipulation). It will not do for plaintiffs to show a few isolated examples of "seller's puff."

### B. *Individual Issues.*

In its brief amicus, the S.E.C. lists seven common questions of fact and four common questions of law in this case:

*Questions of Fact:*

"(1) whether certain statements were publicly made and disseminated and whether they were false; (2) whether other statements were publicly made and disseminated and whether they were misleading because of material omissions; (3) whether such acts and omissions improperly affected the market price of Monsanto securities purchased by members of the represented class and, if so, to what extent and at what time; (4) whether any, some or all defendants acted in concert to effect this result; (5) whether any, some or all defendants sold securities of Monsanto at a price which was arbitrarily high as a result of their activities; (6) whether members of the represented class, or subclasses thereof, purchased securities of Monsanto at a price which was arbitrarily high as a result of defendants' actions; and (7) whether members of the represented class, or subclasses thereof, relied upon the market price of Monsanto securities as having been established by proper means when, in fact, it was not."

*Questions of Law:*

"(1) whether the alleged actions of any or all defendants, if proved, constitute violations of any or all of the statutory provisions relied upon by plaintiffs; (2) whether a private right of action exists predicated upon any or all of the alleged violations; (3) whether affirmative defenses, such as the statute of limitations, may appropriately be applied to bar any or all claims made by any or all members of the class, and (4) if liability is found, what is the proper method for computation of damages with respect to any or all claims for which relief is found appropriate?"

In spite of this abundance of common questions, defendants argue that each member of the class would have to prove reliance, compliance with the statute of limitations, and damages, and thus the common questions cannot be said to predominate over those affecting individual members. To "acknowledge defendants' position at this point would be, in effect, an emasculation of the vitality and pliability of the amended rule." *Siegel v. Chicken Delight, Inc.*, 271 F.Supp. 722, 727 (N.D.Cal.1967). The common issues need not be dispositive of the entire litigation. The fact that questions peculiar to each individual member of the class may remain after the common questions have been resolved does not dictate the conclusion that a class action is not permissible.

In fact, in the present case, these individual questions present "no difficulty not inherent in every securities class action." *Kronenberg v. Hotel Governor Clinton, Inc.*, 41 F.R.D. 42, 45 (S.D.N.Y.1966). See, e. g., *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 914 (9th Cir. 1964); *Fischer v. Kletz*, 41 F.R.D. 377 (S.D.N.Y.1966); *Brennan v. Midwestern United Life Ins. Co.*, 259 F.Supp. 673 (N.D.Ind.1966) ("Under the flexibility of new Rule 23, it is not likely that the administrative difficulties will outweigh the advantage of handling in one action the similar claims of hundreds of purchasers based upon essentially similar or identical circumstances"); Advisory Committee Notes on Rule 23, 39 F.R.D. at 103 (there

must be a "material variation * * * in the kinds or degrees of reliance" to render a fraud case unsuitable for treatment as a class action); cf. Escott v. Barchris Construction Corp., 340 F.2d 731 (2d Cir. 1965), cert. denied sub nom. Drexel & Co. v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965) (bringing of class action tolls statute of limitations for all members of class). But cf. Berger v. Puralator Products, Inc., 41 F.R.D. 542 (S.D.N.Y.1966). If plaintiffs prevail on the common issues, the court—with close cooperation from counsel for both sides—should have little difficulty developing equitable procedures, appropriate to the circumstances of this case, to dispose of any individual issues.

Moreover, plaintiffs may not even have to prove individual reliance—the only issue that may prove to be troublesome. They are contending that the purchase of Monsanto stock at a price which was. affected by defendants improper activities constitutes sufficient reliance. See Fischer v. Kletz, 41 F.R.D. 377, 382 (S. D.N.Y.1966) ("The parties are at odds over the issue of the kind and degree of reliance on the alleged misrepresentations. Plaintiffs, apparently contend that individual members of the proposed class need not show actual reliance on the allegedly false financial statements in order to recover; * * *. At this juncture, I need not * * * rule on this question"). If this contention ultimately prevails, virtually all that would remain is the purely. mechanical task of computing damages. In any event, this contention is one of the common questions of law.

## VI. DEFINITION OF CLASS

 "By definition, an essential prerequisite to a class action is the existence of a 'class'" whose bounds are precisely drawn. 3A Moore, Federal Practice ¶23.04 at p. 3418. In addition, the parties before the court must be members of the class they seek to repre-

sent. See, e. g., Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); 3A Moore, Federal Practice ¶23.04 at p. 3419.

Plaintiffs have defined the class they purport to represent very broadly. The Dolgows, Mrs. Fischer, and Isaacson seek to represent "all the persons similarly situated, namely, all persons who, without any knowledge of the true facts, purchased any securities of Monsanto on or after December, 1964, or who purchased any securities of Monsanto at a price affected by the aforesaid acts, who were damaged as a consequence thereof." In addition, Mrs. Fischer seeks to represent "all others similarly situated, who purchased securities of Monsanto" in reliance upon Queeny's false report. When pressed on oral argument, plaintiffs' attorney was not able to define with any more precision the bounds of the class he purported to represent except to indicate that the period in which he sought to represent the class began about December 1, 1964 and ended somewhere between September 20, 1966 and January 1, 1967.

Plaintiffs, in contending that this definition is sufficient at this stage of the proceedings, rely strongly on the recent case of Fischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y.1966). In that case, which also involved a series of misrepresentations made over a period of time, the court allowed the plaintiffs to represent "all individuals who bought Yale securities [both common stock and debentures] during the period when the allegedly false and misleading financial statements were issued and circulated." 41 F.R.D. at 384.

The instant case is distinguishable from Fischer v. Kletz in one important respect. Although plaintiffs allege a common course of misconduct as in *Fischer,* they do not qualify as members of the class of purchasers of Monsanto securities during the entire period of alleged misrepresentations. Cf. Richland v. Cheatham, 272 F.Supp. 148 (S.D.N.Y. 1967) (four separate periods of manipu-

lation; none of plaintiffs purchased their shares during any of those periods). While in some instances a person may represent a group of stockholders who were defrauded by the same scheme without having been a shareholder during the entire time, in the present case charting the classes on the basis of period of ownership is helpful at this stage of the proceedings.

■ Isaacson did not purchase his three hundred shares of stock until April 9, 1965. Thus, he is not, on this record, an appropriate representative of persons who purchased Monsanto prior to that date. Since he sold his shares on October 5, 1966, he cannot, on this record, represent those who purchased after this date. Plaintiffs, Dolgows and Mrs. Fischer might qualify as representatives of all purchasers of Monsanto securities between the period of December, 1964 and December, 1965 on the basis of the purchase of two shares of Monsanto common stock in 1964 and two shares in 1965. Under the circumstances of this case, however, purchasers of Monsanto common stock pursuant to this restricted dividend offer cannot fairly be said to typify those persons who independently acquired Monsanto securities on the open market.

■ ■ Plaintiffs also include within the definition of the class they purport to represent purchasers of Monsanto debt securities. Here again plaintiffs cannot satisfy the requirement that they be members of the class since none of the plaintiffs were purchasers of such securities. Although in some cases purchasers of one kind of security may be able to qualify as representative of those who purchased another kind (see Fischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y.1966) ), the circumstances of this case militate against such a result. The only debt securities issued by Monsanto during this period was a bond issue floated overseas. These securities are not traded on any American stock exchange. To include them within the class would unneces-

sarily complicate the action. It is likely that these bonds were sold in large blocs to major financial interests who would not be dependent upon the class action device to vindicate their rights. In addition, the plaintiffs have not presented any information suggesting that there is sufficient identity of interests between the distinct groups of stock and bond purchasers. See Herbst v. Able, 278 F. Supp. 664 (S.D.N.Y.1967).

■ The fact that plaintiffs' definition of the class is not acceptable does not require dismissal of the class allegations. As the S.E.C. noted in its brief, "to effectuate the purpose of the securities laws, courts should employ the full measure of the discretion granted by the Rule, whenever a fair reading of the complaint permits, to define classes of injured investors in a manner which will permit utilization of the class action procedure." Cf. Rule 23(c) (4) ("a class may be divided into subclasses").

■ In the present case, two classes to which the parties before the court can fairly be said to belong may be charted with requisite precision: (1) those persons who purchased Monsanto common stock in connection with the 1964 and 1965 stock dividends; (2) those persons who purchased Monsanto common stock from April 9, 1965 to October 20, 1966 (Isaacson class). The fact that these classes may overlap is not significant at this stage of the litigation. If it should later appear that a scheme to defraud was not carried on during the entire period Isaacson was a shareholder, the class can be further narrowed. Cf. Richland v. Cheatham, 272 F.Supp. 148 (S.D.N.Y.1967) (four separate periods of manipulation). The fact that plaintiffs cannot state the exact numbers of people in the Isaacson class or identify them by name is irrelevant. As Judge Tyler stated in Fischer v. Kletz:

"It is true that plaintiffs have not defined the exact number of people in the class that they purport to represent. The class itself, however, has been de-

fined with some precision, i. e., all individuals who bought Yale securities during the period when the allegedly false and misleading financial statements were issued and circulated. Therefore, the group represented cannot be called 'amorphous' (see Zachman v. Erwin, 186 F.Supp. 681, 688 (S.D.Tex.1959) ), and the failure to state the exact number in the class does not preclude the maintenance of a class action. To place such a burden on plaintiffs would seem harsh and unnecessary. In fact, the imposition of such a requirement would make the maintenance of class actions in large securities-fraud cases very difficult, if not impossible, and would be contrary to the observation of the Advisory Committee that 'a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action * * *.' 39 F.R.D. at 103." 41 F.R.D. at 384.

Subsumed within the Isaacson class and the 1965 stock dividend class are those persons who purchased shares in reliance on the Queeny report to the S.E. C. The Queeny report must be considered, at this stage of the litigation, a part of the entire scheme. It would only needlessly complicate the case at this point to create another subclass for those who relied on his statement.

■■■■ Defendants would narrow the class still further. First, they argue that separate classes can be created on the basis of those who still retain their stock and those who have already sold. These two groups can be differentiated only on the basis of their damages. This distinction bears no relation to the common questions relating to liability that will be tried as part of the class action so that a narrowing of the class for this reason at this stage of the litigation is not warranted.

■■■■ Second, defendants would distinguish between those who purchased in reliance on the defendants' alleged misrepresentations and those who purchased at a price affected by defendants' manipulations. To so fragment the class now would serve no useful purpose. Plaintiffs, as already noted, are contending that they need not prove individual reliance, but merely that all members of the class purchased their stock at a price affected by defendants' manipulations. If this common question of law is resolved in favor of plaintiffs, no one would have to prove reliance. If it is resolved against plaintiffs, there would be no need to have a class composed of those who had purchased without reliance at a manipulated price.

## VII. ADEQUATE REPRESENTATION

Subdivision (a) (4) of Rule 23 requires that "the representative parties will fairly and adequately protect the interests of the class." The question of adequacy of representation is of greater significance under the new rule than under the old. The former "spurious"—as contrasted with "true"—class action, was little more than a permissive joinder device. Since only those members of the class who actually intervened would be bound by an unfavorable decision, the courts felt little need to conduct a "searching inquiry" into the adequacy of representation. See, e. g., York v. Guaranty Trust Co., 143 F.2d 503 (2d Cir. 1944), rev'd on other grounds, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

■■■■ Under the new rule, however, as in the case of the old "true" class action, members of the class not before the court are bound unless they affirmatively exercise their option to be excluded from the action. They may find themselves bound even though they were not actually aware of the proceeding. In such circumstances, the contention that adequate representation is lacking becomes weighty and "the interests of the affected persons must be carefully scrutinized to assure due process of law for the absent members." Carroll v. American Federation of Musicians, 372 F.2d 155, 162 (2d Cir. 1967). See, e. g., Fisch-

er v. Kletz, 41 F.R.D. 377, 383 (S.D.N.Y. 1966).

■ Two requirements need to be met in order for the court to be satisfied that the representative parties will adequately protect the interests of the class they seek to represent. First, "the interests of the unnamed persons * * * [must be] closely identified with the interests of the representatives"— i. e., they must be members of the class sharing common issues and interests. Chafee, Some Problems of Equity 231 (1950). See e. g., Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); Carroll v. American Federation of Musicians, 372 F.2d 155, 162 (2d Cir. 1967) ("Since all members of the class are to be bound by the judgment, diverse and potentially conflicting interests within the class are incompatible with the maintenance of a true class action."); 3A Moore, Federal Practice ¶23.07 at p. 3427 (2d ed. 1967) ("the interest of the named representative * * * must be co-extensive with the interest of the other members of the class"). Second, the court must be assured that "the representatives [will] put up a real fight." Chafee, Some Problems of Equity 231 (1950).

■ Both these requirements have been met in the present action. No conflict of interest between the representatives and the represented has been suggested. There is nothing to indicate that the plaintiffs do not intend to prosecute this action vigorously or that plaintiffs' attorney is not competent to do so.

Nevertheless, defendants forcefully contend that representation requirements have not been met. They rely upon: (1) the miniscule holdings of plaintiffs; (2) the numerical disparity between those before the Court and those they seek to represent; and (3) the inability of plaintiffs' attorney to represent such large classes.

A. *Miniscule Holdings of Plaintiffs.*

■ In contending that the size of the claims of the parties before the court should be given great weight in determining the question of adequacy of representation, the defendants assume that the plaintiffs' force in prosecuting the action is proportionate to the amount they hope to recover. This equation is based on the assumption that the plaintiffs bring this action solely to recover their individual damages. The realities of the situation here and in the vast majority of class actions suggest that the amount of possible recovery by the class rather than by the individual plaintiffs furnishes the motivating force behind prosecution. See Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966) ("We can safely assume that no lawyer of competence is going to undertake this complex and costly case to recover $70 for Mr. Eisen."); Murphy v. North American Light & Power Co., 33 F.Supp. 567, 570 (S.D.N.Y.1940) ("these causes looked at in their true light are really voluntary speculations in fees by the attorneys for the complainants").

In some areas of the law, society is dependent upon "the initiative of lawyers for the assertion of rights" (Escott v. Barchris Construction Corp., 340 F.2d 731, 733 (2d Cir.), cert. denied sub nom. Drexel & Co. v. Hall, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965) ) and the maintenance of desired standards of conduct. The prospect of handsome compensation is held out as an inducement to encourage lawyers to bring such suits. See Murphy v. North American Light & Power Co., 33 F.Supp. 567, 571 (S.D. N.Y.1940) ("allowances in cases of this kind * * * should not be niggardly for appetite for effort in corporate therapeutics should * * * be encouraged"); Hornstein, Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, 69 Harv.L.Rev. 658, 662–63 (1956) ("The value of class actions, albeit reward-inspired, has been repeatedly established in recent decades by shareholder's suits"); cf. Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 269 F.Supp. 540 (E.D.Pa.1967) (antitrust treble dam-

age action—"The strong incentive of triple recovery encourages private litigants to vigorously enforce the antitrust laws"). The instant case presents a classic example of such a lawsuit. Quite obviously, a major incentive to forceful prosecution is the substantial counsel fee plaintiffs' attorney believes he may be awarded if he is successful.

To assert that the minute interests of the parties before the court is a factor which militates against allowing a class action is to ignore the spirit of Rule 23. Since, as we have seen, if the plaintiff's claim is very large a class action is rendered unnecessary, the main purpose of the class action is to provide a means of vindicating small claims. It would be anomalous to hold that only major financial interests can make use of it. But cf. Richland v. Cheatham, 272 F.Supp. 148, 153 (S.D.N.Y.1967); Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147, 150–51 (S.D.N.Y.), leave to appeal granted, 370 F.2d 119 (2d Cir. 1966).

Large publicly owned corporations tend to be highly capitalized with large amounts of stock outstanding. Most shareholders own comparatively few shares of stock. The few persons who do own a substantial bloc of stock in a corporation are usually either officers, directors, or other "insiders"—in a word, the very people whose conduct the securities laws are designed to regulate. Therefore, to restrict the use of the class action to those persons would virtually preclude its application in the area of securities regulation. In any event, under the special circumstances of this case, no shareholder could have purchased more than one share of stock in any one year pursuant to the Monsanto stock dividend offer.

Finally, we need no longer be unduly concerned that small shareholders will misuse the class action device by bringing strike suits. See Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 548, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528 (1949) ("And it was said that these suits were more commonly brought by small and irresponsible than by large stockholders, because the former put less to risk and a small interest was more often within the capacity and readiness of management to compromise than a large one."). As we have seen, Rule 23 contains sufficient protective provisions to adequately guard against such abuse.

B. *Numerical Disparity Between Those Before the Court and Those They Seek to Represent.*

There is, of course, "no magic in numbers * * *. The quality of representation is more important than numbers." 2 Barron and Holtzoff, Federal Practice and Procedure, § 567 at pp. 306–07 (Wright ed. 1961). See also 3A Moore, Federal Practice, p. 3430 (2d ed. 1967) ("The history of Rule 23 * * * makes it clear that number is not in itself determinative of adequacy or inadequacy of representation."). Were it otherwise, a premium would be put on injuring large groups of people. In the present case, even if there were one hundred parties of record, there would still be only an exceedingly small percentage of the classes before the court.

The fact that in this case there are only four plaintiffs—all of whom are related to each other or are close friends—before the Court at the present time, while the classes they seek to represent have a total of over two hundred thousand members, is not necessarily indicative of a lack of agreement between class members and their self-appointed representatives. There are two possible explanations for this situation other than acquiescence in defendants' activities by other members of the class. First, the action has received virtually no publicity and thus it is probable that most members are not aware of it. Second, under the new Rule every member of the class is assured of sharing in a favorable verdict without having to intervene; their failure to come forward is as consistent with the view that they are sitting back,

watching the action proceed, content with the job their representatives are doing, as it is with the view that they disapprove of the action. Cf. Weeks v. Bareco Oil Co., 125 F.2d 84, 91 (7th Cir. 1941) ("In the instant case we have two plaintiffs suing for or on behalf of nine hundred. This, on its face, seems small, but nevertheless a suit may be welcomed and supported, in fact, by a large percentage of said nine hundred, although many would not care to start separate, individual suits."); Statement of Professor Ben Kaplan, Reporter of New Rules, quoted in Frankel, Amended Rule 23 From A Judge's Point of View, 32 Antitrust L.J. 295, 299 (1966) ("As he and the committee saw it, the likelihood is that this guy will routinely ignore, or at least fail to respond to, the notices contemplated under (c) (2). On that premise, the vote went the way we see to the effect that a non-response means inclusion rather than exclusion."). Thus, at this early stage of the proceedings, when the court has yet to determine whether there is any merit to plaintiffs' claim, the lack of participation by other members of the class would not justify the drastic step of ruling that this litigation could not proceed as a class action.

### C. Ability of Plaintiffs' Attorney to Adequately Represent Large Class.

Defendants' final argument on the question of adequacy of representation goes to the qualifications of plaintiffs' attorney and his ability to represent such large classes. The representation might be so poor that the judgment would not have any res judicata effect. See Hansberry v. Lee, 311 U.S. 32, 61 S. Ct. 115, 85 L.Ed. 22 (1940). The defendants would then be in the position of having gone through a contested litigation only to be forced to relitigate the entire controversy. While it seems doubtful that this threat is serious in view of the running of applicable statutes of limitation, we assume that this is a matter of legitimate concern.

Defendants point out that plaintiffs' counsel graduated from law school only seven years ago and is handling the case by himself. They suggest that he was only retained by these plaintiffs because he is closely related to them.

■■ This argument is untenable. Plaintiffs' counsel is admitted to practice in both state and federal courts. Until the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession. In point of fact, irrefutable evidence of his competence and fervor is reflected in the papers and arguments thus far submitted by the plaintiffs' attorney. He has demonstrated that he is both willing and competent to undertake the responsibilities which this litigation entails.

Moreover, in a case such as a stockholder's class action which is pregnant with public interest, defendants may be "underestimat[ing] the ability of a court to safeguard the interests of all parties." Siegel v. Chicken Delight, Inc., 271 F.Supp. 722, 727 (N.D.Cal.1967). Subdivision (d) (2) of Rule 23 gives the courts express authority to give those not before the court "the opportunity * * * to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action." In addition, under subdivision (d) (3) the court may impose "conditions on the representative parties." It has a broad range of discretion to assure adequacy of representation according to the individual circumstances of every case.

Defendants also maintain that, in view of the nature and size of the classes involved here, no lawyer—no matter how large his office, no matter how vast his experience—could adequately represent the interests of those not before the court. If this argument were accepted, resort to the class action would be automatically precluded in cases where large

numbers of investors had been defrauded through complex schemes and the perpetrators of such schemes would be assured of virtual immunity from many of the penalties provided by the securities laws—a patently absurd result.

The lawyer's task with respect to common questions of law and fact is not more difficult whether he is representing one person or a class of a million. In either case he will have to prove the same allegations if he is to prevail.

There are, of course, procedural and psychological problems in a class action which are absent in an individual suit. Chief of these is that of notification, with its attendant publicity, which is discussed below.

## VIII. NOTICE

Defendants vigorously advance the argument that this litigation should not be allowed to proceed as a class action since plaintiffs could never provide the necessary notice. Rule 23 requires the "best notice practicable" to other members of the class. It provides:

"(2) In any class action maintained under subdivision (b) (3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

"(3) * * * The judgment in an action maintained as a class action under subdivision (b) (3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in subdivision (c) (2) was directed, and

who have not requested exclusion, and whom the court finds to be members of the class."

In effect, potential plaintiffs are relieved of the burden of coming forward and silence is binding.

This provision has been the subject of sharp criticism. See Supplemental Report, Committee on Federal Rules of Civil Procedure, Judicial Conference—Ninth Circuit, 37 F.R.D. 71, 80–82 (1964). Some courts have been quick to point out the added importance that now attaches to the notice requirement. Richland v. Cheatham, 272 F.Supp. 148, 156 (S.D.N.Y.1967); Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147, 151 (S.D.N.Y.), leave to appeal granted, 370 F.2d 119 (2d Cir. 1966).

In determining what constitutes "the best notice practicable under the circumstances," it is necessary to remember that the recent amendments were specifically designed to broaden the usefulness of the class action device. See, e. g., Cohn, The New Federal Rules of Civil Procedure, 54 Geo.L.J. 1204, 1214 (1966) ("This complete overhaul of rule 23 significantly expands the scope of class actions"). By overemphasizing the notice requirement that purpose may be defeated. Cf. Greater Iowa Corp. v. McLendon, 378 F.2d 783, 797 (8th Cir. 1967) ("We think dissenting security holders have absolute right to challenge management and to question entrenched management's stewardship. No arbitrary blocks or barriers should be raised by the courts in exercising this phase of corporate suffrage."); Philadelphia Housing Authority v. American Radiator & Sanitary Corp., 269 F.Supp. 540 (E.D. Pa.1967) ("The strong incentive of triple recovery encourages private litigants to vigorously enforce the antitrust laws. Against this backdrop, unwarranted stays of proceedings stymie and offset any incentive otherwise contained in the possibility of triple recovery."); Derdiarian v. Futterman Corp., 223 F.Supp.

265, 271 (S.D.N.Y.1963) ("Since the Congressional policy is, in part at least, an attempt to recompense defrauded purchasers of stock, this purpose is furthered by a liberal rule of survival under the securities acts."). To require the present plaintiffs to provide immediate actual notice to each member of the classes involved would, for all practical purposes, spell the immediate end of this litigation.

■ Subdivision (c) (2) does not state that the plaintiffs shall provide notice. Rather, it provides that notice shall be given as "the court directs." See School District of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa.1967) (court declines plaintiffs' offer to provide notice); cf. Developments in the Law—Multiparty Litigation in the Federal Courts, 71 Harv. L.Rev. 874, 938 (1958) ("The court should be given the power to assign this burden [of giving notice] in appropriate situations").

■ Without now deciding what, if any, form of notice will be required, at least two possible methods of providing notice suggest themselves in the instant case. First, Monsanto might be required to notify those members of the classes who are still Monsanto shareholders. Second, the remaining members could be notified by publication. The cost of publishing might be borne by the court or by the parties as directed by the court. Should it be decided that notice by publication is not desirable, it might be necessary to limit the classes to include only those who could be provided with notice from current Monsanto shareholder lists.

A. *Notice to Monsanto Shareholders.*

■ There are three bases for requiring a corporation to notify its shareholders of an action such as this. They are the fiduciary obligations of the corporation, the advantage to the corporation of a judgment with res judicata effects against a class, and the ability to bear the cost.

1. *Fiduciary duty owed to purchasers of stock by the corporation and the selling directors, officers, and other insiders.*

Prior to the promulgation of S.E.C. Rule 10b–5, although it was clear that a fiduciary duty was owed to selling stockholders (see Henn, Corporations, p. 379 (1961) ), the question whether this same duty was owed to "outsiders" buying into the corporation was not free from doubt. As Judge Learned Hand, speaking for the Court of Appeals, declared:

"For many years a grave omission in our corporation law had been its indifference to dealings of directors, or other corporate officers in the shares of their companies. When they bought shares, they came literally within the conventional prohibitions of the law of trusts; yet the decisions were strangely slack in so deciding. When they sold shares, it could indeed be argued that they were not dealing with a beneficiary, but with one whom his purchase made a beneficiary. That should not, however, have obscured the fact that the director or officer assumed a fiduciary relation to the buyer by the very sale; for it would be a sorry distinction to allow him to use the advantage of his position to induce the buyer into the position of a beneficiary, although he was forbidden to do so, once the buyer had become one." Gratz v. Clayton, 187 F.2d 46, 49 (2d Cir.); cert. denied, 341 U.S. 920, 71 S. Ct. 741, 95 L.Ed. 1353 (1951).

See also 3 Loss, Securities Regulation 1455 (2d ed. 1961) (citing Gratz v. Clayton with approval).

This doubt was dispelled by S.E.C. Rule 10b–5 which provides:

"§ 240.10b–5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any

facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase *or sale* of any security." (Emphasis supplied.)

 Both the courts and the Commission have construed this provision as creating "a form of *fiduciary relationship between so-called corporate 'insiders' and 'outsiders' with whom they deal in company securities* which places upon the insider duties more exacting than mere abstention from what generally is thought to be fraudulent practices." Kohler v. Kohler Co., 319 F.2d 634, 637 (7th Cir. 1963) (emphasis supplied). See also Cady, Roberts & Co., 40 S.E.C. 907, 913–914 (1961) ("There is no valid reason why persons who *purchase* stock from an officer, director or other person having the responsibilities of an 'insider' should not have the same protection afforded by disclosure of special information as persons who *sell* stock to them. Whatever distinctions may have existed at common law based on the view that an officer or director may stand in a fiduciary relationship to existing stockholders from whom he purchases but not to members of the public to whom he sells, it is clearly not appropriate to introduce these into the broader anti-fraud concepts embodied in the securities acts."). "These underlying principles apply not only to majority stockholders of corporations and corporate insiders, but equally to corporations themselves when acting through their officers, directors or agents." Kohler v. Kohler Co., 319 F.2d 634, 638, 7 A.L.R.3d 486 (7th Cir. 1963).

 When considered in conjunction with the additional two factors discussed below, we do not think it would always be unreasonable to require a corporation to provide notice once a prima facie case of breach of fiduciary duty has been established.

2. *Interest of defendants in res judicata decree.*

The defendants have "an interest in having all the members of the plaintiff class bound by the decree and may, therefore, be required to share in the burden of providing notice to absentees." Developments in the Law, Multiparty Litigation in the Federal Courts, 71 Harv. L.Rev. 874, 938 (1958). If they prevail on the merits or settle the case, the defendants clearly benefit if all absentees are bound by the judgment. See Cherner v. Transitron Electronic Corp., 221 F.Supp. 48 (D.Mass.1963). Moreover, the provision binding those who do not request exclusion was partially designed to benefit defendants in class actions. Under the old rule, some courts followed a procedure in spurious class action cases quite unfavorable to defendants by allowing class members "to intervene *after* a decision on the merits favorable to their interests, in order to secure the benefits of the decision for themselves, although they would presumably be unaffected by an unfavorable decision." Advisory Committee Notes to Rule 23, 39 F.R.D. at 105. See, *e. g.*, Union Carbide & Carbon Corp. v. Nisely, 300 F.2d 561 (10th Cir. 1961), pet. cert. dism., 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962). The new Rule abolishes this "one-way" intervention.

3. *Ability to bear expense of notice.*

From a practical point of view, in some instances only the defendants can bear the expense of providing notice. See Developments in the Law, Multiparty Litigation in the Federal Courts, 71 Harv. L.Rev. 874, 938, n. 462 (1958) ("The clas-

sic example [of the court's assigning the burden of providing notice to the defendants] is the stockholder derivative suit in which the corporate defendant is better able to bear the expense of providing whatever notice is required to be given to absentees during the course of the litigation."). The mechanics for addressing and mailing by the corporation are normally readily at hand and all that would be required would be an additional enclosure in the next communication to shareholders.

B. *Notice by publication to those who are no longer shareholders.*

■ Notice by publication to those persons who are no longer Monsanto shareholders may be permissible under Rule 23 in the circumstances of this case. A large percentage of this group seemingly cannot be identified at all because it purchased stock in "street name." In view of the inordinate expense that would be involved in locating and mailing notice to tens of thousands of transitory shareholders, it would be anomalous to say that this litigation may proceed as a class action and then lay down a condition which could never be met. Notice by publication might well be the most practicable method, both of giving notice and of identifying members of the class.

In Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), the Supreme Court declined to decide whether such notice by publication would satisfy the constitutional standards of due process. It noted:

"Nor do we find it necessary for the decision of this case to say that, when the only circumstance defining the class is that the determination of the rights of its members turns upon a single issue of fact or law, a state could not constitutionally adopt a procedure whereby some of the members of the class could stand in judgment for all, *provided that the procedure were so devised and applied as to insure that those present are of the*

*same class as those absent and that the litigation is so conducted as to insure the full and fair consideration of the common issue."* 311 U.S. at 43, 61 S. Ct. at 119. (Emphasis added.)

 The Supreme Court has indicated that adequacy of representation, not form of notice, is the crucial consideration. See Hansberry v. Lee, 311 U.S. 32, 42, 61 S.Ct. 115, 118, 85 L.Ed. 22 (1940) ("this Court is justified in saying that there has been a failure of due process *only in those cases where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it."*) (emphasis supplied); Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921); cf. Chafee, Some Problems of Equity, 231 (1951). But cf. Richland v. Cheatham, 272 F.Supp 148, 156 (S.D.N.Y.1967); School District of Philadelphia v. Harper & Rowe Publishers, Inc., 267 F.Supp. 1001, 1005 (E.D.Pa.1967); Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147, 151–152 (S.D.N.Y.), leave to appeal granted, 370 F.2d 119 (2d Cir. 1966).

Moreover, in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)—upon which the notice provision of Rule 23 is patterned—the Court indicated that a pragmatic, case-by-case approach to this issue is warranted. Due process, declared the Court, requires "notice and opportunity for hearing appropriate to the nature of the case," taking into account its "practicalities and peculiarities." 339 U.S. at 313, 314, 70 S.Ct. 652, 656.

 The use in Rule 23 of the phrases "best notice practicable" and "identified through reasonable effort" manifest an intention not to insist on delivery of notice to each member of the class in every case. The adoption of the rule is itself a prima facie judgment that procedures consonant with its language are constitutional. Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

Notice by publication cannot, at this preliminary stage of the litigation, be excluded as inappropriate. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 319, 70 S.Ct. 652, 659, 94 L.Ed. 865 (1950) ("This type of trust presupposes a large number of small interests. The individual interest does not stand alone but is identical with that of a class. * * * Therefore, notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all."); Note, 67 Harv.L.Rev. 1059, 1064 (1954) ("Even where notice to the absent members is required, it may not be necessary to notify every member. There may be some cases in which the considerations in favor of notice to absent members would permit random notice to a part of a large class where the group notified is sufficiently numerous to assure adequate representation."). Notice by publication is likely to be more effective here than in the usual case where it often amounts to no more than a "mere gesture." As the S.E.C. points out in its brief:

"In view of the existence both of a cohesive financial community, which includes broker-dealers who have obligations to their investor clients, and of publications exclusively concerned with matters of interest to that community, publication by itself might reasonably be expected to reach a significant portion of any class of public investors."

In sum, the problems of notice under Rule 23, while substantial, are not insurmountable. They do not, standing alone, warrant terminating the class aspects of this suit at this time.

## IX. HEARING

"Under the present Rule 23, an allegation of class representation is attended by serious consequences." Philadelphia Electric Co. v. Anaconda American Brass Co., 42 F.R.D. 324, 328 (E.D. Pa.1967). Both the parties before the Court and the unnamed persons described in the complaint are affected. For instance, the notice provisions themselves may prove harmful to defendants since the attendant publicity and its official source may inflate the apparent importance of the action. See S.E.C. Brief ("existence * * * of a cohesive financial community"); cf. Cherner v. Transitron Electronic Corp., 201 F.Supp. 934, 936 (D.Mass.1962) (If this Court were to grant plaintiffs' motion, the normal consequence would be that many persons would incorrectly infer that this Court regarded the plaintiffs' complaint as prima facie well-founded). So much of the stock market depends upon faith and reputation that the Court should be reluctant to lend its weight to any unnecessary publicity in connection with a pending lawsuit.

A case such as the present one should not be allowed to proceed as a class action unless the plaintiffs are able to convince the Court that there is a substantial possibility that they will prevail on the merits. Something more than the certification of good ground by an attorney is required. See Fed.Rules Civ.Proc, Rule 11 ("The signature of an attorney [on a pleading] constitutes a certificate by him that * * * to the best of his knowledge, information, and belief there is good ground to support it."). In this case, an evidentiary hearing at which the plaintiffs will be required to make such a preliminary showing should be held before the class action motion is decided.

Such a preliminary hearing is authorized by the Rules of Civil Procedure. See Rule 23(d) ("In the conduct of actions to which this rule applies, the court may make appropriate orders * * * (3) imposing conditions on the representative parties or on intervenors"); Rule 43(e) (evidence on motions; "the court may direct that the matter be heard wholly or partly on oral testimony * * *"); cf. Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 371, 86 S.Ct. 845, 850, 15 L.Ed. 2d 807 (1966) ("We assume it may be

possible that there can be circumstances under which a district court could stop all proceedings in a derivative cause of action, relieve the defendants from filing an answer to charges of fraud, and conduct a pre-trial investigation to determine whether the plaintiff had falsely sworn either that the facts alleged in the complaint were true or that he had information which led him to believe that they were true."). In determining whether good cause existed for the purpose of requiring a litigant to submit to a physical examination pursuant to Rule 35, the Supreme Court recently used language applicable to class actions:

> "Rule 35, therefore, requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the Rule's requirements of "in controversy" and "good cause," which requirements, as the Court of Appeals in this case itself recognized, are necessarily related * * * This does not, of course, mean that the movant must prove his case on the merits in order to meet the requirements for a mental or physical examination. Nor does it mean that an evidentiary hearing is required in all cases. This may be necessary in some cases, but in other cases the showing could be made by affidavits or other usual methods short of a hearing. It does mean, though, that the movant must produce sufficient information, by whatever means, so that the district judge can fulfill his function mandated by the Rule." Schlaugenhauf v. Holder, 379 U.S. 104, 118–119, 85 S.Ct. 234, 243, 13 L.Ed. 2d 152 (1964).

The requirement of a hearing on a motion for a preliminary injunction at which the Court considers "the likelihood that one party or the other will prevail at trial" provides a close analogy to the hearing required in this case. De-

velopments in the Law, Injunction, 78 Harv.L.Rev. 994, 1056 (1965). A preliminary injunction is a drastic remedy and like a decision to permit a case to proceed as a class action, it may be dispositive of the case for all practical purposes. Cf. Philadelphia Electric Co. v. Anaconda American Brass Co., 42 F.R.D. 324, 328 (E.D.Pa.1967) ("no litigant should be permitted to enhance his own bargaining power by merely alleging that he is acting for a class of litigants.").

Faced with a doubt about whether the representative device was appropriate, some courts have allowed the case to conditionally proceed as a class action. They have postponed notice to other members of the class pending further discovery. See, e. g., Siegel v. Chicken Delight, Inc., 271 F.Supp. 722, 728 (N.D.Cal.1967); Fischer v. Kletz, 41 F.R.D. 377, 386 (S.D.N.Y.1966) ("Although a class action might seems appropriate at this time, subsequent development of the facts might indicate otherwise."). The procedure of a preliminary hearing on the merits, to be utilized here, is similar in effect. Under the circumstances of the present case, a preliminary hearing takes on some aspects of a "controlled discovery," based primarily on documentary evidence. Should the action not be permitted to proceed on behalf of a class there will be considerable saving in discovery and motion practice since, as already noted, it is unlikely to be prosecuted.

The hearing in the present case will focus on what appears to be the heart of plaintiffs' claims. It will consist of two stages. First, plaintiffs will be required to make a showing that there was a material discrepancy between the individual defendants' predictions concerning Monsanto's future prospects and what actually occurred.

If plaintiffs fail to satisfy their burden of proof on this issue, the class allegations will be struck. If they do satisfy it, the second stage of the hearing will commence. Defendants will then produce: (a) the securities portfolios

of the individual defendants over the last ten years; (b) records of Monsanto's dealings in its own stock over the last five years; and (c) internal corporate memoranda containing the information that the individual defendants relied upon in making their predictions concerning Monsanto's future prospects. If this material tends to show that there was no "suspicious" or unusual pattern of securities transactions during the period in question and that, on the basis of the information before them, the estimates of the individual defendants were reasonable, the class allegations will be struck.

The parties will arrange for an early conference with the Court to discuss procedure at the preliminary evidentiary hearing.

So ordered.