**REPUBLIC NATIONAL BANK OF
DALLAS, Trustee, et al.**

v.

**DENTON AND ANDERSON
COMPANY et al.**

Civ. A. No. CA3-6854-F.

United States District Court,
N. D. Texas,
Dallas Division.

May 6, 1975.

Robert L. Blumenthal, Fletcher L. Yarbrough, Rod Phelan, Dallas, Tex., for plaintiffs.

Stanley E. Neely and Andrew Barr, Don L. Case, John B. Kyle, Dallas, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PORTER, District Judge.

This case was filed by seven Plaintiffs, all former shareholders of the Defendant Denton and Anderson Company (hereinafter referred to as D & A). It was filed individually and on behalf of all other former shareholders who sold their stock to D & A pursuant to an allegedly fraudulent tender offer made by the Company. Now before the Court is the Plaintiffs' Motion to Certify the Case as a Class Action. No preliminary evidentiary hearing was held; however, the briefs and oral argument of able counsel for the parties were heavily sprinkled with evidence deduced by discovery. Numerous depositions have been filed into the record of the Court and their evidentiary use for purpose of this ruling is by agreement of counsel. In this case, I consider this procedure sufficient to apprise the Court of all information needed for determination of the class issue. For the reasons outlined below, I find that the action should proceed as a class action under Rule 23 (b)(3).

## THE FACTS [1]

Each of the named Plaintiffs became shareholders in D & A in February of 1968 and each of their decisions to purchase the stock grew out of their separate relationships with the Plaintiff Arnold Ablon, a Dallas Certified Public Accountant who operates his own accounting firm. Sometime during 1967, Ablon became aware of the financial difficulties experienced by acquaintances of his, Mr. Harry Newman and members of his family. Newman was a ten percent shareholder and a former principal of D & A. He had pledged 6400 shares of D & A as collateral for a loan of approximately $225,000.00 from the Union Commerce Bank of Cleveland, Ohio. According to Newman's repre-

---

[1]. I do not in any manner intend to intimate that this recitation constitutes a finding of fact conclusive upon the merits of this action. Indeed, the state of the law appears unclear concerning the proper scope of this Court's inquiry into the merits of the litigation while making a class determination. Compare Mersay v. First Republic Corp. of America, 43 F.R.D. 465 (S.D.N.Y.1968) and Huff v. N. D. Cass Company of Alabama, 485 F.2d 710 (5th Cir. 1973) (en banc). A discussion of this problem appears more fully in the text of this opinion, *infra*. The above section of the opinion is merely to provide the nexus of what is generally undisputed fact necessary to make an intelligent appraisal of the ability as well as desirability of the maintenance of class relief in this action.

sentations to Ablon in 1967, this block of stock was worth one million dollars. It was, however, in imminent danger of foreclosure and Ablon decided to attempt to market the stock in an effort to provide cash to pay off the loan.

Ablon requested D & A to purchase the Newman stock, but he was not satisfied with the offer made by the principals of D & A. Attempts to pursuade D & A and some other company to cooperate on a secondary public offering also proved fruitless. Finally, Ablon decided to purchase the stock himself and for that purpose he formed a group of associates into a loose investment syndicate. The members of this syndicate are the named Plaintiffs in this action.

The six named Plaintiffs other than Ablon are the Dave Hicks Company, Inc. which is the alter-ego of Dave Hicks, a man involved for several years in selling and financing of mobile homes, real estate, and other investments; Robert Kellen, a Certified Public Accountant and former partner of Ablon; three brothers, Lester A., Milton P., Jr., and Irvin L. Levy, all as Co-Trustees with the seventh Plaintiff, the Republic National Bank of Dallas, solely in its capacity as Co-Trustee of separate trusts established by the Levy brothers for the benefit of their children. All three Levy brothers are officers of the National Chemsearch Corporation, a large chemical manufacturing company whose stock is listed on a national stock exchange. National Chemsearch Corporation has conducted several public offerings of stock and the Levy brothers have each made numerous other investments.

Each of these purchasers has given his own reasons for buying the Newman stock of D & A, but it is safe to assume that all possess financial acumen and experience and that each believed he was making a sound investment. Illustra-

tive of this observation is the plain statement by the Plaintiff Hicks made in his deposition that after examining D & A's financial statements "I felt like it was worth more [than his purchase price] or I wouldn't have bought it."

The Newman block of common stock in D & A consisted of 6400 shares. Of this total, 700 shares were Class A voting stock and 5700 were Class B nonvoting stock. The final transaction between the Newmans and the Ablon group broke down into three distinct agreements. Ablon alone purchased 640 shares of Class B stock for $36.41 per share and the Newmans used all of these funds to pay the loan from the Union Commerce Bank. Three of the named Plaintiffs also purchased outright from Newman 200 shares of Class A stock for $50.00 per share. Out of this price $13.59 per share was paid as a premium to Newman for his personal needs, and the balance was applied to the Union Commerce debt. The terms of the agreement provided for the purchase of the 200 shares in the following amounts and percentages:

| OWNER | CLASS A (VOTING) COMMON STOCK NUMBER OF SHARES | PER-CENTAGE |
|---|---|---|
| Dave Hicks Co., Inc. | 120 | 60% |
| Arnold N. Ablon | 50 | 25% |
| Levy Trusts; Republic National Bank, Trustee | 30 | 15% |
| TOTAL | 200 | 100% |

The remaining 5,560 shares were sold to the Ablon group for the same $36.41 per share price with both classes of stock being considered of equal value. Included in this third agreement was a provision that the Newmans would receive one-half of any net profit made through a subsequent re-sale of the

stock. Such a provision had been affirmatively omitted from the first two agreements. The purchasers of this 5,-560 share block were:

| OWNER | CLASS A (VOTING) COMMON STOCK NUMBER OF SHARES | CLASS B (NON-VOTING) COMMON STOCK NUMBER OF SHARES | PERCENTAGE OF TOTAL SHARES OWNED UNDER PURCHASE AGREEMENT |
|---|---|---|---|
| Dave Hicks Co., Inc. | 300 | 3,036 | 60% |
| Arnold N. Ablon | 105 | 1,063 | 21% |
| Levy Trusts, Republic National Bank, Trustee | 75 | 759 | 15% |
| Robert Kellen | 20 | 202 | 4% |
| TOTAL | 500 | 5,060 | 100% |

The named Plaintiffs severally executed an escrow agreement with the Mercantile National Bank in Dallas under which the bank held the 5,560 shares as nominee custodian and manager to be directed by a majority in interest. The group knew that D & A was a closely-held corporation, and although some may have had hopes for a public offering in the future, they were aware that no current public market of the stock for its fair value could be made.

For several months after the acquisition of the Newman stock by the Ablon group, relations between the majority and minority shareholders of D & A went. relatively smoothly. By the summer of 1971, however, it had become apparent that the minority interests were quite intent on gaining a public market for their stock. Generally, management was opposed to these efforts, but during the later months of 1971 and the early part of 1972, D & A did conduct serious negotiations concerning a merger with a conglomerate called Katy Industries. In June of 1972, D & A issued a public announcement that an agreement in principal had been reached between Katy and D & A for the sale of D & A for $12.5 million dollars or approximately $175-200 per share.

The contemplated transaction was a mixture of cash, notes, and stocks. Details were never finalized, but generally Katy was to have received the primary income generating subsidiary of D & A, the Taylor-Winfield Corporation, a manufacturer of heavy capital goods, primarily resistance welders. The majority shareholders of D & A were to retain most of the physical assets such as realty.

Despite the announcement, D & A decided to decline the Katy offer. Instead management began to explore the possibilities of making a tender offer for all of the minority shares. Counsel was retained for preparation of the offer and the Defendant First of Michigan Corporation (hereinafter referred to as FOM), an investment banking firm, was hired to make an appraisal of the minority stock.

FOM valued all of the stock of D & A at $131 per share. After application of a 27½% discount due to the majority's control over dividends and marketability, FOM appraised the minority stock at $95 per share. In December of 1972 D & A published and sent to its shareholders a tender offer, offering $85 per share. The tender offer painted a negative, if not altogether dismal picture of D & A's future. It contained a statement by management descriptive of the Katy offer and the purported reasons for its rejection.

The tender offer was accepted by all of the minority shareholders including each of the named Plaintiffs and they

received payment for their shares in January of 1973. Various personal reasons are asserted for their acceptance at that time, but generally their present contention is that they were all surprised at the reversals described by the document, but each felt he had no alternative but to believe it and get out of the company. There is, however, indication that the Ablon group simply did not consider the tender offer adequate and was actively considering legal action. This suit was filed on February 26, 1973.

Named as Defendants are D & A, its five directors, two other individuals who were purportedly inside shareholders, and FOM. Generally, the Plaintiffs contend that the Defendants, with the exception of FOM, engaged in a course of conduct over a period of years that had as its purpose the prevention of minority shareholders from marketing their shares in D & A with the ultimate result being that the Defendants could acquire the minority shares at less than their true value. Specifically, the Plaintiffs complain that the tender offer was the consummation of the fraud.

The tender offer is said to have been unfair in that its price was less than one-half the alleged true per share value of the stock. Further, the tender offer is termed substantively false and misleading and amounting to a common law breach of fiduciary duty. In support of these contentions, the Plaintiffs rely primarily upon the merger offer made by Katy. It is conceded that D & A had no affirmative obligation to accept the Katy offer, but it is the Plaintiffs' contention that this offer is evidence of the true value of the stock and its rejection was an element of the alleged scheme of the Defendants to squeeze out the minority shareholders of D & A.

The Amended Complaint raises two basic substantive issues: (1) fraud, both statutory under the Securities Exchange Act of 1934, Rule 10b–5, and the Texas Securities Act, and common law;

and, (2) breach of fiduciary duty. Fourteen affirmative acts of misrepresentations, twenty-seven material omissions and six specific acts of conspiracy are alleged. Various other acts by some or all of the Defendants amounting to breaches of fiduciary duty and/or negligence are also alleged.

Compensatory damages are sought in the amount of the number of minority shares multiplied by the difference between the actual value per share of the minority stock and the amount per share actually paid by D & A in the tender offer. In addition to an award for reasonable costs and attorney fees, punitive damages in the amount of five million dollars ($5,000,000) are sought against all Defendants except the two inside shareholders who were not directors.

## THE POTENTIAL CLASS

As stated, Plaintiffs seek under Rule 23 to represent all of the minority shareholders of D & A at the time of the tender offer. There is some uncertainty regarding the effect of beneficial ownership and therefore the exact number of potential class members has not yet been ascertained. In any event, the number is somewhere in the range of 45–60.

The Plaintiffs concede that many of these individuals possess some personal or professional relationship with the Defendants. One is T. D. Long, a director of D & A and himself a defendant in this suit; three others are members of Long's family. Another member of the Plaintiffs' prospective class is W. A. Anderson, the former President and Chairman of the Board of D & A, uncle of the Defendant J. Denton Anderson and great-uncle of the Defendant John A. Anderson; fifteen members of the W. A. Anderson family were also minority shareholders and are potential class members. Yet another 15–20 possible class plaintiffs are current or retired employees of D & A or members

of their families. There appears to be about 10–15 prospective class members who would not seem to bear any relationship to any of the Defendants.

## RELEVANT CLASS ACTION LAW

A threshold issue is numerosity. For the maintenance of a class action Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Impracticality in this context does not mean impossibility but merely difficulty or inconvenience. See Vernon J. Rockler and Company v. Graphic Enterprises, Inc., 52 F.R.D. 335 (D.Minn.1971). The Defendants argue that when those minority shareholders who are connected with D & A are discounted, only 10–15 prospective plaintiffs remain and that this number is too small to justify the utilization of the class action device. The problem with this theory is that it requires the Court to speculate on which minority shareholders would opt-out of the class. The class action rule should not be interpreted so that this Court engages in a subjective analysis of the size of the potential class. To so speculate would undermine the purpose of the opt-out provision of Rule 23(c)(2). See Siegal v. Chicken Delight, Inc., 271 F. Supp. 722 (N.D.Cal.1969). From an objective viewpoint there are over forty potential class members who reside in eleven different states. I find as a matter of law that their joinder would be impractical under 23(a)(1).

The thrust of the Defendants' opposition to class certification arises under sub-parts (a)(2), (a)(3) and (b)(3) of Rule 23 which require that common questions of law or fact predominate and that the claims of the named Plaintiffs be typical of the claims of the remaining members of the class. Basically, the Defendants' argument is that the named Plaintiffs are vulnerable to certain defenses, e. g. reliance, estoppel, due diligence, and waiver, which might not be applicable to the other minority shareholders of D & A. No discovery of absent class members has to date occurred and the Defendants apparently rest their assumptions upon the unique relationship which the named Plaintiffs had with the Defendant D & A. The Plaintiffs' complaint is, of course, couched to avoid these defenses. Thus, this Court's initial duty is to ascertain to what extent it can look past the face of the pleadings and consider the merits of the alleged defenses as they bear on the requirements of Rule 23.

The Supreme Court has recently announced that the so-called "mini-hearing" into the merits of the Plaintiffs' claims in a class action is an unwarranted invasion into the substance of the action. Eisen v. Carlisle and Jacquelin Co., 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Such a hearing had its birth in Dolgow v. Anderson, 43 F.R.D. 472 (S.D.N.Y.1968). The notion expressed in *Dolgow* was that the trial court should make an early determination of whether the Plaintiff really had a chance of success before undertaking the massive task of managing a complex class action. See 84 New York Law Journal 1. *Eisen* rejected this procedure as constituting a premature decision on the merits.

I am inclined to agree that any decision this Court makes with regard to factual disputes can possibly have undesirable effects on the conduct of the litigation. Our procedural system is structured so that fact finding should be the climax of litigation. It seems obvious to me that when the Court makes any preliminary finding of fact, the bargaining position of one party will be damaged throughout the remainder of this suit. The Court must temper its understandable desire for procedural efficiency so that the ability of the parties to deal with each other and the Court is not undermined.

Nevertheless, it seems equally obvious that an intelligent appraisal of the class

question involves a certain degree of inquiry into the factual status of the litigants. I see this inquiry as absolutely essential for the Court to identify relevant legal issues which it must decide in the Rule 23 certification procedure. See B & B Investment Club v. Kleinerts, Inc., 62 F.R.D. 140 (E.D.Pa. 1974). In the instant case, the need for the Court to decide questions of commonality and typicality under Rule 23 classically illustrates the imperative nature of some factual inquiry.

The Defendants rely heavily upon the Fifth Circuit's *en banc* decision in Huff v. N. D. Cass Company of Alabama, 485 F.2d 710 (5th Cir. 1973), to urge that the Court should consider evidentiary facts in resolving the class action issue. The Defendants read *Huff* to allow the trial court the freedom at this preliminary stage to decide whether the named Plaintiffs will fail on their individual claims because of a legal defense applicable only to the proposed representatives. I do not read the *Huff* opinion so broadly, rather I note the Court's language recognizing the slippery distinction between a decision on class maintainability and a decision "on the merits".[2] I see the problem as essentially one of identification, and any finding that the mere presence of varying defensive issues would defeat class status would be erroneous. Green v. Wolf Corp., 406 F.2d 291 (2nd Cir. 1968). My present duty is to gain a general grasp of the factual situation and ascertain if it is compatible with the legal device of a class action.

■ Turning then to the factual basis of this action, I see two basic legal issues that arise: (1) Do the various defensive issues that the Defendants allege exist only with regard to the named Plaintiffs preclude this Court from determining that common questions of law or fact predominate as required by Rule 23(b)(3) for class certification? and (2) Does the unique investment relationship which the named Plaintiffs had with each other and the Defendant D & A place them in so different a posture that their claims are not typical of the other class members as required by 23(a)(2) since most of the absent Plaintiffs bear some direct or indirect economic relationship to the Defendants?

It should first be noted that these two issues are not altogether distinct, rather they overlap to a great degree. If defensive issues unique to the named Plaintiffs predominate then the same facts would likely render atypical the individual claims of those representatives. I conclude, however, that neither issue should defeat class certification.

The Defendants have hammered away at the issue of reliance. Their position is that reliance is a necessary element of proof in a securities fraud action and they apparently believe the issue varies between the absent class members and the named Plaintiffs. Numerous other defenses already described are said to be unique to the Ablon group, however, I believe that reliance is at the root of all these questions. A decision on whether its presence defeats certification should be determinative of all the individual-question defensive issues.

The parties have briefed and argued extensively the continuing debate over whether reliance is in fact an element of a cause of action for securities fraud. In Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court ruled out reliance as an element in a total non-disclosure situation. The in-

---

2. Judge Godbold said that " 'on the merits' is an elusive term at best, not wholly suitable as a guideline in [the class action] situation." 485 F.2d at 714. He also described the competing arguments in this debate as one "which says find out about plaintiff's claim at an early stage and the other . . . which says just don't find out too much . . .." *Id.*

stant case, however, concerns not only omissions but written and oral representations that were allegedly false or misleading. The Fifth Circuit has indicated in the post-*Affiliated Ute* decision of Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 482 F.2d 880 (5th Cir. 1973) that it still believes there is a need to show some degree of reliance in a written misrepresentation case. Since I conclude that the issue does not defeat certification, I prefer not to make a decision at this preliminary stage on the requirement of reliance in this case. It is sufficient to say that it is a real legal issue that this Court will at some point have to confront.

Predominance of common questions of law or fact under Rule 23(b)(3) is not a numbers game. The true test is whether common or individual questions will be the object of most of the efforts of the litigants and the Court. Professor Moore says:

> "[t]he fundamental question is whether the group aspiring to class status is seeking to remedy a common legal grievance." 3B Moore's Federal Practice ¶ 23.45[2], p. 23–756 (1974). See also Siegal v. Chicken Delight, Inc., *supra.*

Though there may be several individual questions present, if the basic issue is still common and pervasive, class status is appropriate. See Dorfman v. First Boston Corp., 62 F.R.D. 466 (E.D.Pa. 1974); Livesay v. Punta Gordo Isles, 379 F.Supp. 386 (E.D.Mo.1974).

I could agree with the Defendants that reliance should defeat class status if the alleged misrepresentation had varied among the purported class members. In that event innumerable fact questions would be present making treatment as a class action unwise. As stated in the Advisory Notes to Rule 23 and reiterated by the Second Circuit in Green v. Wolf, supra:

> ". . . although showing some common core, a fraud case may be unsuited for treatment as a class action

if there was a material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." 406 F.2d at 300–301.

Such is not the situation here; instead, there is really only one central question and that is whether the minority shareholders of D & A were defrauded. The basic tool of the alleged fraud was the tender offer. Each of the class members received the same document. There simply were no material variations in the representations made to the potential plaintiffs.

It is the Defendants' position that regardless of this common core, there is such a varying degree of reliance between the named Plaintiffs and the absent parties that it makes the case unsuited for class treatment. See Morris v. Burchard, 51 F.R.D. 530 (E.D.Pa. 1971). It is true that if it appears defensive issues would dominate the course of the litigation, certification should not be granted, Koos v. First National Bank of Peoria, 496 F.2d 1162 (7th Cir. 1974); but I am not convinced that in this case these questions are so pervasive that they will be predominate. To ascertain whether individual reliance questions are predominate, this Court must again look toward the merits of the defense allegations. It must be decided just how strong a reliance case the Defendants have against each Plaintiff or each group of Plaintiffs and then there must then be a decision on whether the presentation of that portion of the Defendants' proof will prevail over the presentation of common issues.

The deposition testimony does raise questions concerning the confidence the Ablon group had in the tender offer, and assuming non-reliance is an element of the Plaintiffs' burden of proof, I do not doubt the issue will be present. It is the nature of the buy and sell securities market which yields a reliance question in almost every stock fraud action. Kronenberg v. Hotel Governor Clinton,

Inc., 41 F.R.D. 42 (S.D.N.Y.1966). Its mere presence, however, should not defeat class status unless there are such obvious variances between the reliance by the proposed representatives and the absent class members that the Court can determine the issues will predominate with little inquiry into the merits. Livesay v. Punta Gordo Isles, *supra*; Green v. Wolf, *supra*.

After review of the depositions taken in this case, I see no basis for a finding of that kind of obviousness. This is not the case of hundreds of unwary shareholders being unknowingly duped and then a few sophisticated investors who should have known what was happening all along turning around to try representing the whole lot. *Cf.*, Simon v. Merrill Lynch, *supra*. In such a situation, it might well be obvious that reliance problems would be so great that the focus of the litigation would be on the particular status of the named Plaintiffs. Looking at the evidence now before me and identifying the issues, I am of the opinion that the major portion of this case will remain centered on the question of the existence of a fraud, and will not be concentrated on the various defensive issues peculiar to the named Plaintiffs.

The named Plaintiffs' unique relationship with D & A may have caused them to pay such unusual attention to their investment that they are vulnerable to certain affirmative defenses. It is not appropriate, however, for me to now decide that point under the guise of a ruling on class certification. I think it wiser to leave such a determination to trial or the summary judgment process. Dorfman v. First Boston Corp., *supra*. To do otherwise would require this Court to delve too far into the merits of the potential defense and the result would be a premature adjudication of the issues. *Eisen, supra.*

The decision in *Huff, supra,* allowed the maintenance of a class action despite the failure on the merits of the named Plaintiffs' individual civil rights action. In this securities case, however, the ability of the Ablon group to maintain this suit as a class action might well be affected by entry of an adverse judgment on their individual claims; but, this is an issue better addressed when the need arises. Neither do I feel a present need to address each of the defensive questions of law that the Defendants assert may have individual overtones. As stated previously, I believe that reliance is at the root of them all, and my reasons for finding that they do not defeat certification are identical to my analysis relative to reliance. I cannot find that their added presence in the litigation will change the focus of its conduct.

I do direct my attention to one additional argument of the Defendants concerning commonality. The contention is that for the class members to prove their state law claims, it will be necessary to determine and apply the conflicts of law doctrines of each state in which a transaction occurred. (*i. e.* in the eleven different states in which the class members reside.) Defendants believe that the prospect of such a task should persuade this Court to refuse certification. First, since only the law of Texas has yet been plead, I would think that any recovery under another state's law, *albeit* by a non-resident and absent class member, would be suspect. Further, there are only a limited number of conflicts rules in the fraud area, and I do not view the problem as particularly complex. As has been stated about reliance, it is the nature of a securities action that there will be some degree of variance; Kronenberg v. Hotel Governor Clinton, Inc., *supra*, but I don't think it is sufficient to foreclose the use of the class action vehicle under the guise of the lack of predominance.

I conclude that common questions of law or fact predominate and the action

fulfills the commonality requirements of Rule 23(b)(3).

I now turn to the issue of whether the claims of the named Plaintiffs satisfy the requirements of Rule 23(a)(3), which states as a prerequisite to class action maintenance that "the claims or defenses of the representative parties are typical of the claims or defenses of the class . . . ." Other than the defensive issues already discussed, I discern as the only possible aspect of the named Plaintiffs' claims that is atypical is the unique relationship that the Ablon group had with D & A. Their's was strictly a business relationship and they conducted it in that manner. From the depositions it is apparent that Ablon himself had numerous conversations with D & A management about the company's operation and this is undoubtedly different than the posture taken by many of the other shareholders who had more of a personal relationship with the principals of D & A.

Nevertheless, I do not think that from a legal standpoint this situation places the Ablon group in a different position than the other minority shareholders. All were owed duties of care and fairness. Fiduciary obligations do not vary just because the shareholder to whom they are owed happens to be a relative or employee of the corporation's principals. If at trial it is shown that these duties were unlawfully neglected and that the minority shareholders were thereby injured then all should recover.

The Defendants argue that Ablon was imminently associated with the Katy offer himself and that therefore his claim is atypical because the Katy proposal is such an integral part of the Plaintiffs' allegations. Simply because Ablon and other members of his investment group had knowledge of the existence of the Katy offer does not mean that they are any less the victim of a fraud if in fact

such a fraud is proven. The Defendants' typicality argument is only another way of saying that there may be individual defensive issues present. I have already decided that this does not defeat class status in this case.

It may be true that the named Plaintiffs held their stock in D & A in a unique manner and viewed their investment position differently, but from an objective, legal standpoint, there was no variance between the Ablon group and the other minority shareholders in the manner they owned or sold the stock.[3] Thus, if they were defrauded, the other minority shareholders were defrauded and they should be afforded a legal remedy. Providing such a remedy has always been the function of the class suit. Chafee, Some Problems of Equity, p. 244 (1950); Kalven and Rosenfield, The Contemporary Function of the Class Suit, 8 U. of Chicago Law Review, 684, 686 (1941); Kaplan, Continuing Work of the Civil Committee: 1966 Amendments to the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 375–400 (1968).

As discussed with respect to the numerosity requirement, this Court should not engage in a subjective analysis of the class. To make such an inquiry would run afoul with the purposes of the opt-out provision of Rule 23(c)(2). The Defendants assert that many of the proposed class members will not want to join in the action because of personal connections with some or all of the Defendants. This decision, however, must be left to each of them. To do otherwise would force this Court to make unwarranted subjective decisions about the desires of absent Plaintiffs. See Umbriac v. American Snacks, Inc., 388 F.Supp. 265 (E.D.Pa.1975).

Additionally, the Defendants argue that the named Plaintiffs cannot adequately represent the class pursuant to

---

3. There is no evidence that the existence of different classes of stock bears any relationship to the allegations of the Plaintiffs' claim.

Rule 23(a)(4) because the existence of the defensive issues relative to their fraud claims will force them to concentrate on the fiduciary duty aspects of the complaint to the detriment of the absent members. It need only be said that the adequacy question generally arises in the context of competency to protect the class members. As was said in Dolgow v. Anderson, *supra,* at p. 494:

> "the court must be assured that 'the representatives [will] put up a real fight.'"

No reason has been put forward that convinces me these Plaintiffs will without justification abandon any portion of their contentions. See Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D.Pa.1969).

Finally, this Court must decide whether a class action is the superior method of adjudicating the claims asserted. I conclude that it is superior. Generally, the other alternatives: joinder, intervention, consolidation, etc. would not be practical. Reasons why were discussed with respect to numerosity, *supra.* A substantial portion of the class resides in this District and I see no reason why the litigation should not be conducted here; there are no other pending cases regarding the subject matter; and I do not believe that problems of management, while complex are insurmountable.

Rule 23(b)(3)(A) suggests as one criteria in determining superiority "the interest of members of the class in individually controlling the prosecution or defense of separate actions." In connection with my decision on superiority, I have concluded that any conflict the class members might have with the conduct of the litigation are not so great that they should defeat certification. Some of the absent parties may, however, have a substantial interest in refraining from participating at all in the litigation. Therefore, notice under Rule

23(c)(2) should be quite specific. It should outline the allegations of the complaint and should detail the potential liability of the Defendants. Only a notice of this nature will provide the absent class members an adequate opportunity to intelligently decide whether to participate in the class.

I hereby certify the case now before me as a class action pursuant to Rule 23(b)(3). Counsel for the Plaintiffs are directed to submit a form of notice to the class to the Court and opposing counsel within thirty days of the date of this order. Counsel for the Defendants will have twenty days to make objections to the proposed notice.

It is so ordered.