Thomas H. RAMSEY, Jr., et al.

v.

Robert L. ARATA, Individually and
d/b/a Arata and Company and the
Siegel Trading Company, Inc.

Civ. A. No. 3–74–190–F.

United States District Court,
N. D. Texas,
Dallas Division.

Dec. 9, 1975.

Frank G. Newman and Lawrence G. Newman, Dallas, Tex., for plaintiffs.

Joe B. Abbey, Dallas, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PORTER, District Judge.

The plaintiffs in this securities fraud action are three individuals suing pursuant to Fed.R.Civ.P. 23(b)(3) on behalf of themselves and all other persons who purchased securities from the Defendant Robert L. Arata within three years prior to the filing of this suit. Arata has not received service of process since an involuntary bankruptcy petition had been filed against him prior to this suit and in connection with the bankruptcy action all other suits against Arata were stayed by the Bankruptcy Court. Also named as defendants were the Siegel Trading Co., Inc., and Mitchell Larocca, Siegel's Dallas branch office manager.

The original complaint asserts that all defendants are liable for securities fraud due to their connection with Arata in the sale of securities which the plaintiffs believe were fraudulent. Subsequent to the original filing, the plaintiffs voluntarily dismissed Larocca upon information that his only actions pertaining to the subject matter of the case were totally within the scope of his duties as an

agent for Siegel and were not performed in an individual capacity. The principal adversaries now before the Court are, therefore, the named plaintiffs and Siegel. Additionally a group of approximately sixty individuals have moved for leave to intervene jointly and have set forth virtually identical averments as those of the original plaintiffs. Now before the Court are the Motions to Dismiss and to Strip the action of its class standing, each filed by Siegel, and the Motion to Intervene. For the reasons stated below, both motions of Siegel are denied and the action is certified as a class action. The Motion for Leave to Intervene is granted.

## FACTS

Robert L. Arata is an engineer formerly employed by Texas Instruments, Inc., in Dallas (hereinafter referred to as TI). Ostensibly using his technical knowledge, he began trading in the mid-1960's in the commodities market on the basis of a computerized formula. Arata attained a degree of success and soon many of his friends and associates at TI began to express an interest in investing in Arata's system.

Under the auspices of "Arata and Co.", Arata attracted clients by using a form written contract between he and his investors. Each investor was sold "shares" in the company, but Arata maintained exclusive control over all monies and investment decisions. Arata & Co. was to receive twenty-five percent of all profits with the balance being distributed to each investor according to the quantum of his investment. All losses were to be absorbed by the individual investor.

For each investor, Arata prepared and distributed a quarterly statement of the investor's account. Most of these reports reflected trades made by Arata on behalf of the investors, and usually indicated that substantial profits were being accrued. Depositions filed in this Court's record[1] clearly indicate that in nearly every instance these quarterly reports were false. Indeed, many of the investments reported by Arata simply did not occur. Arata's investment operation conducted business until the filing of the bankruptcy petition in December of 1973.

In May of 1972, Siegel Trading Co., Inc., a Chicago based company, relocated its Dallas branch to an office complex unrelated to TI but only a short distance from the company's principal industrial plant. By 1971, Arata had opened a personal account with Siegel styled "Robert L. Arata". In 1972 Arata opened another account styled "Rem Conn" and in August of 1973 a personal account styled "Arata and Company" was opened. The filing of the bankruptcy at the end of 1973 caused all of these accounts to close.

Precisely the extent of the relation between Siegel and Arata is unclear at this juncture of the litigation. This question must be ultimately decided by the trier of fact in connection with a determination of Siegel's liability for any fraud which was allegedly consummated by Arata's business. It does appear, however, that in some ways Siegel treated Arata like an employee or partner. Siegel provided him with office space, secretaries, duplicating machinery, and even paid his health and accident insurance as an employee of the company. Although Arata may have also conducted some of his trades with other brokerage firms, a substantial portion of these transactions were completed through Siegel.

---

**1.** Depositions of various parties to this litigation are in the record pursuant to agreement of counsel that they may be given evidentiary consideration in connection with the Court's ruling on the motions which are the subject of this opinion. This opinion does not, of course, constitute any finding of fact relative to the merits of the action, but merely recognizes the necessity of considering matters which are outside the pleadings to make an intelligent decision on the legal issues presented the Court. *Cf.* Wright & Miller, *Federal Practice and Procedure,* Civil § 1364 (1972); *Republic National Bank of Dallas v. Denton & Anderson Co.,* 68 F.R.D. 208, 209 at n. 1 (N.D.Tex. 1975).

## MOTION TO DISMISS AND FOR A MORE DEFINITE STATEMENT

Count One of the complaint alleges that Siegel was involved in the sale of unregistered securities in violation of § 5(a) and (c), and thus § 12(1) of the Securities Act of 1933, 15 U.S.C.A. §§ 77e(a), (c) and *l*(1) (1973). Count Two alleges securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) (1973), and SEC Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1975). Count Three complains of an alleged fraud in connection with contracts for commodity futures in violation of the Commodities Exchange Act, 7 U.S.C.A. § 1 (1973), *et seq.*

■ Siegel has filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) asserting essentially that: 1) these contracts should not be considered a "security" within the meaning of the securities acts, and 2) Siegel was not a party to the agreements between Arata and the plaintiffs. Initially, it must be noted that this Court, of course, is bound for purposes of the Motion to Dismiss, to accept as true the allegations of the complaint. *California Motor Transportation Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Belt v. Johnson Motor Lines, Inc.,* 458 F.2d 443 (5th Cir. 1972).

Both the 1933 and 1934 Securities Act state that an "investment contract" is a security, the purchasers of which are entitled to the protection of the statutes. The plaintiffs maintain that the futures options sold by Arata fit within this category of the definition of a security. The touchstone of an interpretation of this statutory concept[2], of course, is the Supreme Court's decision in *SEC v. W. J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In *Howey,* the Court developed the so-called "solely

from the efforts of others" test by defining an investment contract as:

A contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. 328 U.S. at 298, 66 S.Ct. at 1103.

The Fifth Circuit has recently refined the *Howey* test in *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir. 1974), declaring that *Howey* should not be literally applied but rather a functional approach should be employed to fulfill the remedial purposes of the securities acts. *Koscot* adopted the Ninth Circuit's standard for defining an investment contract, that is, "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* at 483, *quoting SEC v. Glen W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).

■ The refinements of *Howey* contained in *Glen Turner* and *Koscot* compel this Court to analyze the complaint in terms of the quality of the investor/plaintiff's contribution to the investment scheme in question. I think it is clear that under the plaintiffs' allegations the agreements were securities. The complaint asserts that the plaintiffs entered into agreements authorizing Arata and Company to buy and sell commodity futures on a profit sharing basis. As alleged, the investors relied solely on the efforts of Robert Arata for profits from the investments. Arata's efforts, not the plaintiffs', were the key to the failure or success of these investments. The agreements, therefore, fit within the *Koscot* standard and they must be considered securities within the meaning of the securities acts.

---

**2.** The definitions of "security" in Section Two of the 1933 Act is virtually identical to that contained in Section Three of the 1934 Act. Thus, the analysis of *SEC v. Howey, infra,* is applicable to the plaintiffs' claim under both acts. *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

Siegel initially challenges its amenability to suit under Section 12(1) of the 1933 Act for selling unregistered securities. Generally, the plaintiffs dealt solely with Robert Arata and none of the plaintiffs were in direct privy with Siegel. It is undisputed that Siegel was not the actual "seller" of the "shares" in Arata and Company. The courts, however, have long imposed liability on those who are viewed to be responsible for a sale of unregistered securities even though they did not directly sell the investment. This has been done in recognition of the realities of the securities market where many who do not actually own securities may be deeply involved in their sale.

In *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680 (5th Cir. 1971), the Fifth Circuit specifically adopted the test of *Lennerth v. Mendenhall,* 234 F.Supp. 59 (N.D.Ohio 1964) to determine sufficient culpability to warrant imposition of liability under Section 12(1). Judge Connell stated in *Mendenhall* that "the line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow directly and proximately from the actions of this particular defendant?" *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 693, *quoting Lennerth v. Mendenhall, supra,* 234 F.Supp. at 65. The proximate cause standard for Section 12(1) liability has been reasserted by the Fifth Circuit and it is clearly the proper guide-line for testing the plaintiffs' com-

plaint in this case. See *Lewis v. Walston & Co., Inc.,* 487 F.2d 617 (5th Cir. 1973).[3]

█ In conclusionary terms, the complaint states that Siegel was the "proximate cause of the sale of unregistered securities." Standing alone in the face of Rule 9(b)'s requirement of specific pleading of fraud averments, such a complaint might not survive a Motion to Dismiss. See *Fulton v. Walston and Co., Inc.,* 508 F.2d 577 (2nd Cir. 1974). The complaint continues, however, and alleges several acts and omissions by Siegel which the plaintiffs believe resulted in their injuries. This Court cannot find as a matter of law that these allegations are insufficient to impose liability on Siegel if they are proven to be true. Implicit in this finding is the conclusion that the complaint is plead sufficiently specific to defeat Siegel's Motion for a More Definite Statement.[4]

## CLASS ACTION ISSUE

The three individual plaintiffs seek to maintain this action under Rule 23(b)(3). The proposed class consists of 900 other investors in Arata and Company who reside virtually all over the world. Many never met Arata but merely purchased their interests in the commodities on the advice of others. Arata's business appears to have been the cause celebré of the TI coffee hour and illustrative of the reasoning of those who purchased shares is the statement in the deposition of plaintiff, William T. Witt that he was told by a fellow émployee " . . .

---

**3.** The defendant has only contested the actionable nature of the Section 12(1) claim against it. With respect to the Rule 10b-5 allegations, it should be noted that the Fifth Circuit has recently stated that "before someone can be caught within the net of aiding and abetting liability . . . , another party must have violated the securities laws, the alleged aider-abettor must be generally aware of his role in improper activity, and he must knowingly render substantial assistance." *Woodward v. Metro Bank of Dallas,* 522 F.2d 84 (5th Cir. 1975). The same standard for testing, aiding and abetting liability appears to be appropriate with respect to the plaintiffs' third claim for relief, a count under the Commodities Ex-

change Act. See *Anderson v. Francis I. du-Pont & Co.,* 291 F.Supp. 705 (D.Minn.1968). Suffice it to say that this Court is of the opinion the plaintiffs' complaint in this case states facts meeting the test of *Woodward.*

**4.** The Court does not mean to imply that any complaint stating a claim for relief for securities fraud necessarily meets the particularity requirements of Rule 9(b). I am of the opinion, however, that the averments in this complaint are sufficient to overcome the defendant's Rule 12(e) motion. See generally, Wright & Miller, *Federal Practice and Procedure,* Civil §§ 1297, 1298 (1972).

it's a great deal, you can't beat it, you know we were making money like crazy." Witt deposition, p. 20.

■■■ Opposition to class certification arises from the commonality requirements of Rule 23(a)(2) and (b)(3).[5] As stated by this Court in *Republic National Bank of Dallas v. Denton and Anderson Co.*, 68 F.R.D. 208 (N.D.Tex.1975), the correct standard for determining if common questions of law or fact exists is "whether common or individual questions will be the object of most of the efforts of the litigants and the Court." *Id.* at 215, *citing* Moore, *Federal Practice,* ¶ 23.45[2], p. 23–756 (1974); See also *Dorfman v. First Boston Corp.*, 62 F.R.D. 466 (E.D.Pa.1974). The present task of this Court, therefore, is to analyze the factual background of this action and decide whether the factual and legal issues are sufficiently common among the proposed class members to make the case suitable for class treatment under Rule 23(b)(3). It should again be emphasized that this analysis is not, of course, a finding of fact conclusive upon the merits of the action, and is solely intended to serve as a necessary guidepost for the Court in its class action determination. See n. 1, *supra.*

Siegel argues that the contract agreements were often sold in face-to-face meetings with oral representations, and the defendant believes this created such variances in the class members' relationships to Arata that they should not be allowed to proceed collectively. Such an argument ignores, however, the basis for all of the representations and the basic tool of the alleged fraud, that is, the quarterly reports disseminated to investors by Arata. The quarterly reports appear to have been the critical representation made to class members which affected their investment decision. Personal representations made to class members by Arata or other investors do not, therefore, defeat class status since a case for securities fraud could be established solely on the basis of the quarterly reports, irrespective of any personal representations, if the reports are proved to have been materially misleading either by affirmative misrepresentations or omissions.

■■■ It is true that the contents of the quarterly reports were not identical and to that extent the representations made to the class members varied. The Advisory Committee's Notes to Rule 23 stated that:

. . . although having some common core, a fraud case may be unsuited for treatment as a class action if there was a *material* variation in the representations made or in the kinds of degrees of reliance by the persons to whom they were addressed. (emphasis added).

The point here is that the variances among the quarterly reports were not *material.* The purpose of the reports appears to have been a calculated effort to show ever increasing profits by Arata's investment operation. The existence of minor variations of the facts and figures within the different reports does not alter the fact that the class members received essentially the same representations concerning the prospects for profit by Arata. The Ninth Circuit stated in

---

5. Rule 23 reads in pertinent part:
   (a) One or more members of a class may sue or be sued as representative parties on behalf of all only if . . .
   (2) there are questions of law or fact common to the class . . . .
   (b) An action may be maintained as a class action if . . .
   (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. . . .

*Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909 (9th Cir. 1964):

> Since the complaint alleges a common course of conduct over the entire period, directed against all investors, . . . and violating common statutory provisions, it sufficiently appears that the questions common to all investors will be relatively substantial. *Id.* at 914.

See also, *Grad v. Memorex Corp.,* CCH Fed.Sec.L.Rep. ['73 Decisions] ¶ 94,029 (N.D.Cal.1973). In this case, the quarterly reports are evidence of a common course of conduct and slight, immaterial variations of their contents should not defeat class certification.

▪ Siegel cites *Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 482 F.2d 880 (5th Cir. 1973), and argues that in this Circuit proof of reliance is still an essential element of a claim for relief for a violation of Rule 10b–5 arising out of affirmative written misrepresentations. *Simon* is a decision postdating the Supreme Court's holding in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *Affiliated Ute* ruled out reliance as an element of a total nondisclosure case. Siegel strenuously asserts that the existence of reliance as an element of the cause of action raises an issue of reliance with regard to each individual class member and therefore common questions of law or fact do not predominate.

This Court cannot agree that finding reliance to be an element of a 10b–5 claim is alone adequate to defeat class status. The basis for this position is that the mere existence of individual questions of reliance is not sufficient to warrant a ruling that common questions of law or fact do not predominate. In *Republic National Bank of Dallas v. Denton and Anderson Co., supra,* this Court said that "[p]redominance of common questions of law or fact under Rule 23(b)(3) is not a numbers game." 68 F.R.D. at 215; and as stated above, my present duty is to determine whether common or individual questions will be the focus of the litigation. In this case the central issues concern the alleged fraud by Arata and the extent of the cooperation of Siegel in this activity. These are common issues and I believe they, not the relatively straight-forward questions of reliance, will dominate the conduct of the action.

▪ Although placing primary emphasis on its reliance theory, Siegel also argues that individual questions exist with regard to each class member concerning Statute of Limitation issues. Further, the defendant points out jurisdictional issues relating to the defendant's use of instrumentalities of interstate commerce. Again, the possible existence of these individual issues does not preclude class treatment. These issues are not particularly complex. The applicable Statute of Limitations is the three-year period of the Texas Blue Sky Law, Vernon's Ann.Civ.St. Art. 581–33 (1964); See *Richardson v. Salinas,* CCH Fed.Sec.L.Rep. ['72 Decisions], ¶ 93,353 (N.D.Tx.1972). The only individual questions will be in regard to those who purchased outside the limitations period and who, because they did not discover the violation through reasonable care, should not be included in the class. The jurisdictional issues concerning interstate commerce are settled in the case of most of the class members. Arata apparently mailed the quarterly reports to his investors and regularly used the telephone to talk to the shareholders. These contacts with interstate commerce are in all likelihood sufficient to confer jurisdiction over each class member. See *Dupuy v. Dupuy,* 511 F.2d 641 (5th Cir. 1975).

To hold that the individual issues just discussed necessarily prohibit class treatment in a securities case would do violence to the remedial nature of the securities acts. Professor Loss has stated that "[t]he ultimate effectiveness of the federal remedies . . . may depend in large measure on the applicability of the class action device." *Green v. Wolf Corporation,* 406 F.2d 291 (1968), *quoting* 3 Loss, *Securities Regulation* 1819 (2nd

ed. 1961), 406 F.2d at 295. It has been repeatedly recognized that these types of individual questions are inherently present in every securities case; *Kronenberg v. Hotel Governor Clinton, Inc.,* 41 F.R.D. 42 (S.D.N.Y.1966); *Lamb v. United Security Life,* 59 F.R.D. 25 (S.D.Iowa 1972), and unless it appears that they will be predominate, individual issues do not make a suit inappropriate for class status. That scale of predominance clearly weighs on the side of common issues in this case and considering the criteria of Rule 23(b)(3)(A–D), the Court finds the action to be suitable for class treatment under Rule 23(b)(3).

## MOTION FOR LEAVE TO INTERVENE

■ Rule 23(c)(2)(C) provides that in 23(b)(3) class actions the Court shall give notice to all absent class members that they may enter an "appearance" through their own counsel. Some commentators have suggested that this provision establishes the equivalent of an absolute right to intervene without regard to the normal intervention requirements of Rule 24. See Cohen, *The New Federal Rules of Civil Procedure,* 54 Geo.L.J. 1204 (1966). This Court favors, however, the view of Professor Kaplan, the reporter for the Advisory Committee which drafted the 1966 amendments to the Federal Rules of Civil Procedure, that this rule is only intended to afford absent class members the opportunity to receive pleadings and other papers in the case so that they may decide whether to intervene. Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I),* 81 Harv.L.Rev. 356, 392 at n. 137 (1967).

■ Irrespective of this theoretical problem, in this case the prospective intervenors have already moved for leave to intervene under the permissive intervention provisions of Rule 24(b)(2). A decision on the appropriateness of such an intervention is, of course, within the sound discretion of this Court. Wright & Miller, *Federal Practice and Procedure,* Civil §§ 1911, 1913 (1972). Although no real question of adequacy of representation has been raised, I believe that the proper course in this case is to allow the intervention. Rule 23 recognizes that it is certainly a legitimate desire of the movants to be represented through their own counsel and the only opposition to the intervention coming from the named plaintiffs is the statement that "upon information and belief, many of the intervenors were not investors in Arata and Company but invested in the various limited partnerships organized by Arata." If such a situation does develop, it may be that it will become appropriate for the Court to exercise its authority under Rule 23(d)(3) to limit the role of the appearing parties, including but not limited to, the possibility of creating a sub-class. At this point, however, I believe that the interests of justice will be best served by permitting the intervention.

## CONCLUSION

For all of the above reasons, the Motions to Dismiss and to Strip the action of class status are denied and the Motion for Leave to Intervene is granted. The action is hereby certified a class action to proceed under the provisions of Rule 23(b)(3). Counsel for the plaintiffs shall submit to the Court and opposing counsel a proposed form of notice to the absent class members within forty-five days of the date of this Order and the defendant shall have thirty days to make objections to the proposed notice.

It is so ordered.